[847 NYS2d 536]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TYRONE BOWMAN, Appellant.

First Department, December 13, 2007

**APPEARANCES OF COUNSEL**

*Robert S. Dean, Center for Appellate Litigation,* New York City (*Peter Theis* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Christopher P. Marinelli* and *Mark Dwyer* of counsel), for respondent.

**OPINION OF THE COURT**

CATTERSON, J.

"Every night and every morn

Some to misery are born."*

On the evening of February 28, 2003, Velna Prince, a 28-year-old bank supervisor and the mother of a five-week-old baby girl named Tyshae, went out for the evening with friends. She left Tyshae in the care of the defendant Tyrone Bowman, the baby's father and Prince's live-in boyfriend. During the evening, Prince called home three times before reaching the defendant who assured her that everything was all right.

Upon her return home at approximately 2.30 A.M. the next morning, Prince realized that everything was not all right. Even before she opened her front door, she heard her baby daughter crying in a "moaning manner as if she was in great pain." Inside, the defendant was standing over the bassinet attempting to put a pacifier in Tyshae's mouth. When Prince asked the defendant what had happened, the defendant said nothing was wrong.

When she turned on the light, however, Prince noticed that her baby's eyes were not moving but were "fixed in one spot," that she had a black circle around her left eye (a black eye) and a small mark under her right eyebrow, and that her eye appeared to have dots in it as if bloodshot. Prince persisted with her questioning of the defendant, but he became enraged and struck Prince in the mouth. When she tried to call 911, the defendant disconnected the telephone and hid it, and then stormed out of the apartment.

---

\* "Every night and every morn
Some to misery are born
Every morn and every night
Some are born to sweet delight
Some are born to endless night."
(William Blake, *Auguries of Innocence*.)

Prince carried Tyshae to Harlem Hospital, approximately one block from her home. There, doctors also found red rings around the baby's neck as if "someone had put their hands around and squeezed." The first CT scan at the hospital revealed that Tyshae had a large blood clot on the left side of her brain and smaller blood clots and contusions on the right side, as well as a large bruise on the surface of her head. The doctor in attendance believed that Tyshae had sustained a serious injury as a result of major head trauma. A second CT scan revealed "a global overwhelming injury to the brain caused by lack of oxygen" suggesting that seizures had followed initial injury causing Tyshae to stop breathing.

Dr. Arthur Cooper, the head of the trauma and pediatric surgical services unit, would testify later at trial that it took a fairly large injury to cause Tyshae to stop breathing. He believed that Tyshae's injuries were caused by a direct blow to the left side of her head, which caused her brain to "reverberate within her skull."

Two days later, Tyshae experienced respiratory arrest and seizures and then fell into a coma. On March 5, she was transferred to Columbia Presbyterian Hospital, where "her heart just stopped" 10 days later.

While his baby daughter lay dying, the defendant spoke to Prince's mother and also told her that nothing had happened. He then changed his story and told a social worker at the hospital that while he was changing her, Tyshae had fallen off the bed (a distance of about two feet). The doctors attending baby Tyshae at both hospitals stated that it would be extremely rare for such a fall to result in any significant intracranial injury.

The defendant was charged with depraved indifference murder (Penal Law § 125.25 [4]) and manslaughter in the first and second degrees.

At trial, the People introduced hundreds of pages of medical records and three expert witnesses who proved overwhelmingly that Tyshae's death was not the result of an accidental fall from a bed. Further, the medical examiner testified that Tyshae had died of blunt head trauma, and that the injuries to her head and neck indicated that "she was either hit several times or was hit into something several times." The medical examiner testified that the injuries were the result of "significant force." In particular, she found that the hemorrhaging and damage to the optic nerve sheath and spinal cord were indicative of the force of the blows.

A jury found the defendant guilty of depraved indifference murder. In accordance with the court's instructions, the jury did not consider the other charges. The defendant was sentenced to the maximum of 25 years to life.

On appeal, the defendant, in keeping with the trend among those convicted of depraved indifference murder, asserts that the evidence in this case is insufficient to sustain the conviction since the People's theory of how Tyshae suffered her injuries is more consistent with an intentional act. Further, he argues that the evidence is legally insufficient as to the culpable mental state required for a depraved indifference murder conviction. (*See People v Suarez*, 6 NY3d 202 [2005].)

Pursuant to Penal Law § 125.25 (4) the crime of depraved indifference murder of a child is a nonintentional homicide, which requires proof that an adult defendant, "[u]nder circumstances evincing a depraved indifference to human life . . . recklessly engage[d] in conduct which creates a grave risk of serious physical injury or death to another person less than eleven years old." A reckless mental state exists when a person "is aware of and consciously disregards a substantial and unjustifiable risk" that death or serious injury will occur (Penal Law § 15.05 [3]).

In *People v Suarez (supra)*, the majority held that "a defendant who intends to injure or kill a particular person cannot generally be said to be 'indifferent'—depravedly or otherwise—to the fate of that person." (*Id.* at 211.) Further, the Court held that the statutory language that the defendant act "[u]nder circumstances evincing a depraved indifference to human life" constitutes an additional element of the crime which comprises both depravity and indifference, and has meaning independent of recklessness and the gravity of the risk created. (*Id.* at 214.) Subsequently, in *People v Feingold* (7 NY3d 288 [2006]), the majority made clear that it had overruled *People v Register* (60 NY2d 270 [1983]), and that depraved indifference is a culpable mental state and not an objective assessment of the surrounding circumstances. In *People v Mancini* (7 NY3d 767, 768 [2006]), the majority reiterated that under *Suarez*, "[i]rrespective of what the actor does or does not do after inflicting the fatal injury, depraved indifference murder is not made out unless the core statutory requirement of depraved indifference is established" (emphasis omitted).

Thus, under recent Court of Appeals rulings, evidence is legally insufficient for a depraved indifference murder convic-

tion where there is a manifest intent to kill and/or where the evidence fails to establish the requisite culpable mental state. In this case, the defendant specifically points to the testimony of the attending doctor at Harlem Hospital which established that Tyshae suffered a "very forceful blow to the head, to the point where the brain was jarred, hitting one side of the skull and bouncing back to the other." The defendant argues that, therefore, the only rational inference from the evidence is the defendant's "manifest intent to kill" his five-week-old daughter.

We disagree. Indeed, nothing in the most recent rulings of the Court of Appeals suggests such an inference may or should be drawn from the evidence in this case. The defendant did not grab a shotgun and shoot Tyshae point-blank just below the heart because Tyshae had enraged him. (*See People v Payne*, 3 NY3d 266, 269 [2004].) The defendant did not grab a kitchen knife and stab Tyshae three times in the throat, chest and abdomen because she lunged at him with the knife first. (*See People v Suarez, supra.*) The defendant did not walk up to Tyshae with a gun and shoot her six times in the back of the head from a distance of six inches because he was afraid of her. (*See People v Gonzalez*, 1 NY3d 464 [2004].) Nor did the defendant plot for months with another perpetrator to lure Tyshae to a location where she could be stabbed in the heart with a knife. (*See People v Hafeez*, 100 NY2d 253 [2003].)

Nothing in the record warrants setting aside the jury's conclusion that the defendant acted recklessly rather than intentionally. No testimony or evidence was presented at trial that the defendant had any motive, animosity or ill will towards the victim, or that, previously, he had been an abusive father. In fact, testimony established that until the day he struck Tyshae, he had shared willingly in the caregiving with Prince. Thus, we find that a jury could rationally conclude that the defendant acted recklessly by callously disregarding the potential harm his blows would have on the tiny victim and thereby exposed Tyshae to the risk of severe injury or death without ever intending to bring about those outcomes.

As for the defendant's assertion that the evidence fails to establish the required culpable mental state, we find this argument to be unpreserved. As the People correctly assert, the defendant did not make a specific objection on this ground and so the argument is not preserved for review on appeal. (*People v Gray*, 86 NY2d 10, 20-21 [1995].) Thus, any contention that the People were required to prove that defendant acted with a

subjective mental state of depraved indifference is not preserved because the defendant neither raised that contention in moving to dismiss nor voiced any objection to the court's charge to the jury on the elements of the crime. In essence, the jury was instructed that the People were required to prove a mens rea of recklessness and that the element of "depraved indifference" required an objective assessment of the surrounding circumstances. Accordingly, the sufficiency of the evidence must be reviewed in the light of the elements of the offense as they were charged to the jury without objection. (*People v Sala*, 95 NY2d 254, 260 [2000].)

When so assessed, we find the evidence was plainly sufficient. (*See People v Nix*, 173 AD2d 285, 286 [1st Dept 1991], *lv denied* 78 NY2d 971 [1991] [jury reasonably could have found that defendant's reckless shaking of the 3½-month-old infant created a grave risk of death and did indeed cause serious physical injury under circumstances evincing a depraved indifference to human life]; *People v Goodridge*, 251 AD2d 85 [1st Dept 1998] [defendant's brutal conduct (shaking baby) constituted the kind of recklessness involving a depraved indifference to human life]; *People v Jones*, 236 AD2d 217 [1st Dept 1997], *lv denied* 89 NY2d 1036 [1997].)

In any event, defendant's failure to preserve the issue notwithstanding, were we to review the defendant's assertion that the evidence is insufficient to establish the requisite culpable mental state pursuant to *Suarez*, we would find it also without merit.

The defendant argues that his conduct does not fall within either of the two fact patterns delineated by *Suarez*, because there was no prolonged course of abuse and his mental state in connection with this one time act does not rise to the level of depravity "manifested by brutal, heinous and despicable acts" necessary to establish culpability for second-degree murder. (*See Suarez*, 6 NY3d at 214.) Nor can it be said, he argues, that he abandoned a helpless and vulnerable victim in circumstances where the victim is highly likely to die. (*Id.* at 212-213.)

The defendant, while conceding that Tyshae was a "helpless infant victim" and that he "briefly delayed Prince from contacting 911," nevertheless contends that he did not *abandon* her, but remained with her and tried to comfort her and offered to take her to the hospital. He further asserts that though he prevented Prince from calling 911, failing to summon aid is not a determinative factor in finding depraved indifference murder.

Finally, he argues that he did not engage in *prolonged* physical abuse against Tyshae because he was with the infant for a maximum of six hours and because "even though [the medical examiner] believed that several blows had been landed, she did not suggest that the blows were spread over time." Thus, the defendant argues that since "there was nothing in the medical evidence to suggest that the injuries did not occur in a single swift incident," he did not engage in any "prolonged" abuse as required for conviction pursuant to *Suarez*.

However strenuously the defendant attempts to distinguish his case from those offered as examples of depravity and indifference in *Suarez*, he cannot escape the broad strokes of the decision. Citing, inter alia, to two prior child abuse cases which the Court of Appeals determined to be depraved indifference murder (*People v Best*, 85 NY2d 826 [1995]; *People v Poplis*, 30 NY2d 85 [1972]), the *Suarez* Court summed up depraved indifference as: "wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target of the perpetrator's inexcusable acts" (*Suarez*, 6 NY3d at 213).

Furthermore, the Court held that:

> "depraved indifference is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is 'so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy' as to render the actor as culpable as one whose conscious objective is to kill." (*Suarez*, 6 NY3d at 214.)

We concur with the People's assessment that, "this, of course, is an entirely apt description of defendant's conduct." It is true that there were no witnesses to the events of the six hours between 8:30 P.M. and 2:30 A.M. when Prince left her baby daughter with the defendant. Further, the defendant has never spoken about the events of those six hours other than to produce the entirely incredible tale, which he repeated in his trial testimony, that his five-week-old baby daughter fell off the bed. Nevertheless, baby Tyshae's injuries tell enough of the story to sustain the People's assertion, particularly when viewed through the

eyes of the medical examiner who conducted her autopsy. At trial, the medical examiner testified that Tyshae "was either hit several times or was hit into something several times." In the medical examiner's opinion, "significant force" was required to cause such injuries which were not consistent with any type of a fall from a bed. The medical examiner testified that five-week-old Tyshae's death was the result of being struck four distinct times.

Consequently, to view the defendant's conduct as anything less than depraved indifference would be to shut out of the mind's eye the image of the defendant's adult hand, or fist, smacking the delicate features of his five-week-old baby daughter's face and head. Furthermore, striking her once with a force where "her brain was jarred, hitting one side of the skull and bouncing back to the other" did not give him pause for thought. The defendant struck the helpless baby again, and again for a third time, and again for a fourth time with total disregard for the consequences of his brutality.

Therefore, we find that a jury was entitled to conclude that striking a five-week-old helpless baby in the head with enough force to produce the injuries sustained plainly demonstrates depraved indifference in that such acts "reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target." (*Suarez*, 6 NY3d at 213; *see e.g. People v Cole*, 85 NY2d 990, 992 [1995]; *People v Bryce*, 88 NY2d 124 [1996]; *People v Mills*, 1 NY3d 269 [2003].)

Additionally, as the People assert, striking his baby daughter was not the extent of the defendant's "deplorable" conduct. The defendant's wanton, brutal, heinous, despicable acts were exacerbated by his failure to explain what had really happened and his failure to summon help, even though Tyshae was in obvious distress.

The defendant errs in his assertion that post-incident conduct is irrelevant, and his reliance on *Mancini* and *Suarez* is misplaced. In explaining that failure to summon aid is not a dispositive factor in determining whether a homicide is a depraved indifference murder, the Court of Appeals was simply stating that if it were, then every intentional murder would be "routinely and improperly converted to depraved indifference murder[ ] whenever—as is often the case—the killer leaves the scene." (*Suarez*, 6 NY3d at 210.)

In this case, however, the subsequent conduct of the defendant, who was Tyshae's father and the adult charged with the

duty to care for her, was a further display of his "utter disregard for the value of human life." Again, the defendant is grasping at straws when he argues that, by any strict definition of the word, he did not abandon his daughter. It does not help the defendant's case even if we agreed that was so. What he did was worse. Instead of shutting the door behind him, he shut his eyes and ears to the clear sounds of distress made by a baby too small and helpless to help herself. He sat idly by as his daughter's life began to slip away. He was unmoved by the sounds of her pain which, when heard by her mother prompted a hysterical outburst. Even then, the sight of his daughter, not moving, not reacting to anything (even the offer of a pacifier) left him indifferent to her plight, as did her mother's entreaties to tell her what had happened. The defendant's failure to act was as wanton as his conduct in creating the situation.

This Court, therefore, finds that the jury was entitled to conclude that the defendant caused his daughter's death and that the evidence was legally sufficient to sustain his conviction for second-degree depraved indifference murder. We have considered the defendant's remaining contentions and find them unavailing.

Accordingly, the judgment of the Supreme Court, New York County (Ronald A. Zweibel, J.), rendered May 13, 2004, convicting the defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 25 years to life, should be affirmed.

TOM, J.P., SAXE, FRIEDMAN and McGUIRE, JJ., concur.

Judgment, Supreme Court, New York County, rendered May 13, 2004, affirmed.