(February 18, 2010)

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GREGGARY VARMETTE, Appellant. [895 NYS2d 239]—

Garry, J. Appeal from a judgment of the County Court of Essex County (Richards, J.), rendered March 12, 2007, upon a verdict convicting defendant of the crimes of murder in the second degree (two counts) and endangering the welfare of a child.

On August 2, 2005, Janina McDonald (hereinafter the mother) went to work and left her three-year-old son in the care of defendant, her live-in boyfriend. When the mother returned home

less than 12 hours later, the child was found in his bed unresponsive and barely breathing. Despite medical intervention, the child died two days later from blunt force trauma and a closed head injury, having suffered, among other things, a transected pancreas, a perforated duodenum and subdural and subarachnoid hemorrhages. As a result, defendant was indicted and charged with murder in the second degree (two counts), manslaughter in the first degree and endangering the welfare of a child. Following a jury trial, defendant was convicted of depraved indifference murder (two counts) and endangering the welfare of a child and was sentenced to a controlling prison term of 25 years to life. Defendant now appeals.

Defendant contends that the Special Prosecutor became an unsworn witness during the course of voir dire and, in so doing, "irreparably tainted" the jury panel and committed reversible error. It is well settled that "[a] trial court has broad discretion in controlling voir dire" (*People v Walston*, 277 AD2d 593, 594 [2000], *lv denied* 96 NY2d 764 [2001]; *see People v Jackson*, 306 AD2d 910, 911 [2003], *lv denied* 100 NY2d 595 [2003]). Here, to the extent that inappropriate comments were made, defense counsel raised prompt objections—many of which were sustained—and County Court either instructed the Special Prosecutor as to the proper procedure, curtailed the challenged questioning, clarified the scope of voir dire or gave a curative instruction. Under these circumstances, we cannot say that defendant's right to a fair trial was prejudiced.

Defendant also argues that the evidence adduced at trial was legally insufficient to establish that, under circumstances evincing a depraved indifference to human life, he recklessly engaged in conduct that created either a grave risk of death (*see* Penal Law § 125.25 [2]) or a grave risk of serious physical injury or death to the child (*see* Penal Law § 125.25 [4]). "Evidence is legally sufficient if, when viewed in a light most favorable to the People, there exists any valid line of reasoning and permissible inferences that could lead a rational person to the conclusion reached by the fact finder" (*People v Barreto*, 64 AD3d 1046, 1048 [2009], *lv denied* 13 NY3d 834 [2009] [internal quotation marks and citations omitted]; *see People v Bleakley*, 69 NY2d 490, 495 [1987]; *People v Moore*, 29 AD3d 1077, 1078 [2006]). Addressing the specific elements of depraved indifference murder, a person acts "recklessly" when he or she "is aware of and consciously disregards a substantial and unjustifiable risk" that a particular result will occur (Penal Law § 15.05 [3])—here, a grave risk of serious physical injury or death (*see* Penal Law § 125.25 [2], [4]). "Depraved indifference to human life" is a

culpable mental state that may be established by circumstantial evidence (*see People v Feingold*, 7 NY3d 288, 294-296 [2006]); it requires that the defendant's conduct be "so wanton, morally deficient and devoid of regard for the life or lives of others as to equate in blameworthiness with those killers who intentionally cause death" (*People v Ford*, 43 AD3d 571, 573 [2007], *lv denied* 9 NY3d 1033 [2008]). Depraved indifference murder may be established where the defendant's actions are "directed against a particular victim but are marked by uncommon brutality" (*People v Payne*, 3 NY3d 266, 271-272 [2004]). Single-victim cases require that "the defendant's actions . . . 'reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target of the perpetrator's inexcusable acts' " (*People v Ford*, 43 AD3d at 573, quoting *People v Suarez*, 6 NY3d 202, 213 [2005]; *see People v Smith*, 41 AD3d 964, 966 [2007], *lv denied* 9 NY3d 881 [2007]; *People v Maddox*, 31 AD3d 970, 971 [2006], *lv denied* 7 NY3d 868 [2006]). We find that this standard was met here.

Upon arrival at Fletcher Allen Medical Center in Vermont,[1] the child presented with significant bruising to his arms, trunk, back, head and neck, blood oozing from his nose and mouth, a deeply bruised scrotum, a fractured arm and an abdomen that was "almost as hard as a rock," the latter of which medical personnel determined was due to the presence of free air in his abdominal cavity. Surgery revealed that the child's pancreas had been "torn in two." Additionally, doctors discovered an inch-by-half-inch tear in the child's duodenum that was leaking intestinal contents into the abdominal cavity. The operating surgeon classified these discoveries as "grade five" injuries— the most severe ranking. During the procedure, approximately one liter of fresh blood was suctioned from the child's abdominal cavity, representing between two thirds and three quarters of his overall blood volume. Although the child survived the surgery, he died the following day. The autopsy revealed, in addition to the foregoing injuries, deep contusions to the scalp, swelling of the brain, significant bruising and subdural and subarachnoid hemorrhages. Cause of death was listed as "[m]ultiple blunt trauma and closed head injury." All of the physicians who testified at trial stated that the child's injuries were consistent with blunt force trauma and would require a significant amount of force to generate.

---

1. The child had "coded" by the time emergency medical services arrived at his residence, and it took medical personnel at the local hospital nearly one hour to restore his heartbeat. Due to the severity of his injuries, a transfer to the Vermont facility was arranged.

Defendant, by his own admission, was the sole caretaker for the child between approximately 1:30 P.M. and 11:00 P.M. on August 2, 2005.[2] When the child began vomiting around 5:30 P.M., defendant initially was unconcerned, allegedly thinking that perhaps he had fed the child spoiled food for dinner. When the vomiting persisted, however, defendant began to fear that the child had ingested poison. Despite these concerns and the child's deteriorating condition throughout the evening,[3] defendant did not contact the mother, any member of his extended family or emergency medical services—even though the child admittedly was not acting normally and appeared, after falling while left unattended in the shower, as "very dazed" and seemed as though he was "seeing stars." Between 7:00 P.M. and 8:00 P.M., defendant's landlord heard defendant yelling at the child in an angry tone and heard the child crying, together with a "thumping" sound coming from the vicinity of defendant's bathroom and adjoining hallway. By 10:00 P.M., the child was what defendant characterized as "unresponsive," which he acknowledged was a "very serious" condition. Still, defendant did not contact the mother or summon medical aid. When the mother arrived home from work with friends and began showing them around the apartment, defendant instructed her not to enter the child's bedroom, purportedly for fear of waking him. After the friends left, defendant fixed the mother dinner and volunteered to check on the child. She followed him into the bedroom, found the child barely breathing and wrapped in a heavy blanket on a warm summer night and called 911.

Defendant denied striking or stomping the child and suggested that some of the bruises and the bloody lip he observed were the result of the various stumbles and falls the child had throughout the evening. The doctors who testified at trial, however, made clear that the injuries suffered by the child were inconsistent with defendant's version of the events, could not have resulted from the normal day-to-day activities of a three year old and could not have been incurred by a routine slip and

**2.** Although a neighbor was present in the apartment at some point that evening, defendant acknowledged that this individual was not left alone with the child and conceded that the mother could not have inflicted the underlying injuries. This fact and the relevant timeline are significant because the operating surgeon testified that the pancreatic injury that he observed at roughly 8:30 A.M. on August 3, 2005 was 12 to 18 hours old—placing its occurrence within the window of time when defendant was alone with the child.

**3.** In addition to the episodes of vomiting, the child purportedly bumped his head on the toilet bowl, tripped and fell into the wall in the hallway, fell in the shower and banged his head on the top of his bedroom dresser—all of which defendant attributed to the child's dazed and weakened condition.

fall in the bathroom.[4] Finally, defendant could not account for the injuries discovered on autopsy or the medium velocity blood spatter present in the apartment, stating only that he did not use any force on the child that could have caused the injuries.

Viewed in the light most favorable to the People, the jury reasonably could have inferred that the thumping and crying heard by the landlord on the evening in question were the sounds of the 6½-foot-tall, 240-pound defendant inflicting severe and ultimately fatal injuries upon the child. Similarly, the level of force necessary to, among other things, transect the child's pancreas, the medical testimony establishing that such injury occurred during a time when defendant was the sole caretaker of the child and defendant's failure to summon medical aid even after he admittedly knew that the child was "very sick" and "unresponsive," together with what reasonably could be construed as his attempt to hide the child's condition from the mother, could rationally lead the jury to conclude that the elements of reckless and depraved indifference had been established beyond a reasonable doubt. Thus, we are satisfied that the verdict was legally sufficient to convict defendant of depraved indifference murder (*see People v Smith*, 41 AD3d at 966; *cf. People v Jamison*, 45 AD3d 1438, 1439-1440 [2007], *lv denied* 10 NY3d 766 [2008]; *People v Ford*, 43 AD3d at 572-574).

Assuming, arguendo, that a different result would not have been unreasonable, we nonetheless reject defendant's claim that the verdict was against the weight of the evidence. The jury heard—and plainly rejected—the testimony of defendant and his extended family, the latter of whom offered varying explanations and theories for the bruises observed on the child's face and his fractured arm, including bee stings, clumsy and lethargic behavior, a prior fall from a relative's porch and an automobile accident that occurred roughly two weeks prior to the child's death. In light of, among other things, the uncontradicted medical testimony, we cannot say that the jury failed to give the evidence the weight it should be accorded. Nor did County Court err in denying defendant's request for a circumstantial evidence charge; such charge is not required where, as here, there is both direct and circumstantial evidence of guilt (*see People v Hoffler*, 41 AD3d 891, 893 [2007], *lv denied* 9 NY3d 962 [2007], citing *People v Golston*, 13 AD3d 887, 889 [2004], *lv denied* 5 NY3d 789 [2005]).

---

4. For the child's injuries to have resulted from a fall, the testimony revealed, a "high energy" fall would have been required, i.e., one involving a significant distance. The child weighed approximately 42 pounds and stood only 3 feet, 3 inches tall.

Finally, we find no merit to defendant's claim of ineffective assistance of counsel. To the extent that defendant contends that counsel failed to adequately investigate the underlying charges, interview witnesses or prepare defendant for trial, these claims concern matters outside the record and are more properly the subject of a CPL 440.10 motion (*see People v Echavarria*, 53 AD3d 859, 863-864 [2008], *lv denied* 11 NY3d 832 [2008]). As for defendant's assertion that counsel should not have permitted him to testify, "a defendant who has accepted the assistance of counsel nevertheless retains authority over certain fundamental decisions regarding the case, including whether to testify in his or her own behalf" (*People v Hampton*, 64 AD3d 872, 877 [2009], *lv denied* 13 NY3d 796 [2009]). There is nothing in the record to suggest that defendant's decision to testify was anything other than voluntary, and the fact that he may now regret that decision does not establish that he was denied meaningful representation.

Defendant further ascribes error to counsel's failure to ensure that the word "homicide" was redacted from all portions of the final autopsy report. Although such error may be attributed to counsel's inadvertence,[5] we deem it harmless, as "there is no view of the evidence which would suggest a significant probability that defendant would have been acquitted but for the wrongful admission of this evidence" (*People v White*, 41 AD3d 1036, 1038 [2007], *lv denied* 9 NY3d 965 [2007]; *see People v Phillips*, 55 AD3d 1145, 1147 [2008], *lv denied* 11 NY3d 899 [2008]). We do not require that representation be entirely error free; here, counsel filed appropriate motions, articulated cogent and often successful objections at the suppression hearing and trial, aptly cross-examined the People's witnesses and advanced an alternate theory of the case. Under these circumstances, we are satisfied that defendant received meaningful representation (*see People v Echavarria*, 53 AD3d at 864) and that the verdict as a whole "is attributable to the compelling evidence of defendant's guilt and not to the deficiencies of trial counsel" (*People v Jones*, 47 AD3d 961, 965 [2008], *lv denied* 10 NY3d 812 [2008]). Defendant's remaining arguments, to the extent not specifically addressed, have been examined and found to be lacking in merit.

Cardona, P.J., Rose, Malone Jr. and Stein, JJ., concur. Ordered that the judgment is affirmed.

---

**5.** Defense counsel objected to the fact that the final autopsy report identified the manner of death as homicide, and County Court agreed to redact that reference. However, the word "homicide" actually appeared twice in the final report and, for whatever reason, was redacted in only one location.