■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARIE A. MANOS, Appellant. [901 NYS2d 408]—

Mercure, J. Appeal from a judgment of the County Court of Tompkins County (Sherman, J.), entered March 12, 2008, upon a verdict convicting defendant of the crime of murder in the second degree (two counts).

Defendant was charged in an indictment with murder in the second degree (three counts), aggravated sexual abuse in the second degree (two counts), and endangering the welfare of a child. The charges related to a May 2007 incident in which defendant, while caring for her two-year-old niece, sexually assaulted the child, battered her and left her to drown. At the conclusion of the ensuing jury trial, one charge of murder in the second degree, one charge of aggravated sexual abuse in the first degree and the charge of endangering the welfare of a child were dismissed. Defendant was convicted of two counts of murder in the second degree—depraved indifference murder under Penal Law § 125.25 (4) and felony murder under Penal Law § 125.25 (3)[1]—and sentenced to concurrent prison terms of 25 years to life. Defendant appeals, and we now affirm.

Initially, we reject defendant's argument that her conviction of depraved indifference murder is not supported by legally sufficient evidence and is against the weight of the evidence. A conviction of depraved indifference murder is proper "only when the acts of the defendant are 'marked by uncommon brutality—coupled not with an intent to kill . . . but with depraved indifference to the victim's plight' " (*People v Suarez*, 6 NY3d 202, 211 [2005], quoting *People v Payne*, 3 NY3d 266, 271 [2004]). It is well established that "depraved indifference to human life is a culpable mental state . . . [that] can, like any other mens rea, be proved by circumstantial evidence" (*People v Feingold*, 7 NY3d 288, 296 [2006] [internal quotation marks omitted]; *see People v Jean-Baptiste*, 11 NY3d 539, 542 [2008]). Depraved indifference is ordinarily not present in one-on-one killings where only a single person is endangered; rather, in such cases,

1. Depraved indifference murder, as defined by Penal Law § 125.25 (4), is established by proof that "[u]nder circumstances evincing a depraved indifference to human life, and being [18] years old or more[,] the defendant recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than [11] years old and thereby causes the death of such person." Felony murder is defined by Penal Law § 125.25 (3), which provides as relevant here that "[a] person is guilty of murder in the second degree when . . . [a]cting either alone or with one or more other persons, he [or she] commits or attempts to commit . . . aggravated sexual abuse . . . and, in the course of and in furtherance of such crime or of immediate flight therefrom, he [or she], or another participant, if there be any, causes the death of a person other than one of the participants."

it is evinced only by certain rare, narrowly defined factual circumstances that "reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target of the perpetrator's inexcusable acts" (*People v Suarez*, 6 NY3d at 213; *see People v Payne*, 3 NY3d at 271-272; *see also People v Baptiste*, 51 AD3d 184, 193-194 [2008], *lv denied* 10 NY3d 932 [2008]). Specifically, the crime is established "[f]irst, when the defendant intends neither to seriously injure, nor to kill, but nevertheless abandons a helpless and vulnerable victim in circumstances where the victim is highly likely to die" and "[s]econd . . . when a defendant—acting with a conscious objective not to kill but to harm—engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (*People v Suarez*, 6 NY3d at 212; *see People v Mills*, 1 NY3d 269, 275-276 [2003]; *People v Ford*, 43 AD3d 571, 573 [2007], *lv denied* 9 NY3d 1033 [2008]).

Contrary to defendant's argument that the People failed to establish the element of depraved indifference to human life, we conclude that, viewed in the light most favorable to the People, the evidence readily established that defendant acted with the requisite mental state. The child's parents testified that prior to being dropped off at defendant's house on the morning of May 15, 2007, the child was in good spirits and had no illness or injuries other than diaper rash, a small bruise on her chin and a stubbed toe. The child's mother called defendant at approximately 2:15 P.M. and 2:45 P.M., leaving a message to let defendant know that she could pick up the child. Although defendant did not attend her scheduled doctor's appointment that day, she called the mother at 3:30 P.M. to inform her that she and the child had just returned from the appointment, stated that the child had fallen asleep in the car and suggested that the mother let the baby sleep for a while before picking her up.

When the mother arrived at defendant's house at 4:30 P.M., she heard defendant angrily yelling at the child and then, upon gaining entry to defendant's residence, found the child lying naked on a bed and making strange noises, with her eyes rolling back in her head and water coming out of her mouth. After directing defendant to call 911, the mother left—in a state of hysteria—to get the child's father, who was working at a nearby construction site. When the father arrived at defendant's residence shortly thereafter, he saw defendant sitting on the front step, holding the child, who was unconscious, blue, bloated, and had water and what appeared to be blood coming out of her nose and mouth. The father noted that the child's hair was

perfectly dry. Nevertheless, defendant informed the father and a 911 operator that the child had just slipped in the bathtub and swallowed water.

Similarly, in her statement to police, defendant stated that the child arrived at her house at approximately 11:00 A.M. and had diarrhea, necessitating a bath during which the child ingested a small amount of water when defendant turned her back. Ultimately, however, defendant admitted that she was frustrated because the child had defecated in her bed and in the bathtub. Defendant stated that she "lost control" while roughly washing the child's genital area, purposefully held the child's face under the water until she stopped fighting and screaming, and then propped the child up in the tub and left her alone, despite her knowledge that the child had ingested a large amount of water and was unresponsive. When defendant checked the child again, she had slipped back under the water. Defendant further admitted that although she attempted to perform CPR on the child and that the child was bleeding from her genital area after the bath, she did not seek medical attention before the mother arrived.

At trial, first responders to the scene testified that they observed milky fluid with brown chunks in it coming from the child's mouth, as well as red marks on her forehead and bruising once she was given oxygen, turning her color from blue to pink. Upon the child's arrival at the hospital at approximately 5:40 P.M., she was examined by an emergency medicine physician who observed evidence of significant trauma to her head, including multiple contusions and bruises on her face, head, neck, shoulders and above her left eye, as well as broken blood vessels on her face resulting from severe pressure having been applied at some point. Further examination revealed a "fairly severe trauma to the eyes"—i.e., severe distortion of the retinas indicative of shaken baby syndrome—edema and a puncture wound or tear in the vagina caused by penetration, blood in the urethra or bladder, and significant distension of her bowel indicating that the drowning had occurred "a few hours" earlier. The examining physician concluded that the child's injuries were not consistent with an accidental drowning, particularly given the "tremendous" amount of water in her lungs and multiple blows sustained to the head.

The child was then transferred to another hospital where two physicians and a sexual assault nurse examiner observed bleeding from the vaginal area, a puncture and tear in the vaginal area that had been inflicted within the last 24 hours and that was consistent with attempted penetration by a finger, abra-

sions to the rectal area, extensive bruising on the child's torso, bruises on the child's ear and chin that were inconsistent with accidental trauma, and burst blood vessels on the child's face. The child's parents were then informed that she had irreversible brain damage. They agreed to the removal of life support, and the child died.

Mary Jumbelic, the chief medical examiner who performed the autopsy on the child, concluded that the child's death resulted from "asphyxia due to blunt head trauma and drowning," and that sexual abuse was a contributing factor. Jumbelic also opined, based upon the presence of retinal hemorrhaging, that the child had been shaken. Furthermore, she observed numerous bruises on the child's head, cheeks, forehead, shoulders, arms, back, buttocks, lower extremities, front legs, inner thighs and iliacs caused by blunt force injury and contact with a right-angled object, an indentation on the left side of the scalp caused by the head being pressed against something, grab marks on the child's ears and chin, and multiple injuries to the vaginal and rectal area caused by penetrating trauma inflicted by a finger. While defendant's expert medical examiner testified in response that there was no evidence of sexual abuse and that the child's injuries could have been caused by aggressive medical treatment and resuscitation efforts, the expert indicated that he would have classified the child's death as a homicide, that many of the child's injuries were "red flags for child abuse," and that the burst blood vessels indicated direct pressure—which concededly could have been from the bottom of a bathtub—being applied "for an extended period of time."

Under these circumstances—and, in particular, given the detailed testimony from medical personnel regarding the extent of the child's injuries and the evidence from which it can be inferred that defendant deliberately prolonged the child's suffering by both failing to seek medical attention and preventing the mother from discovering the child's condition—it cannot be said that "there is [no] valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial" (*People v Bleakley*, 69 NY2d 490, 495 [1987]; *see People v Varmette*, 70 AD3d 1167, 1169-1171 [2010]; *People v Griffin*, 48 AD3d 1233, 1234-1235 [2008], *lv denied* 10 NY3d 840 [2008]; *People v Heslop*, 48 AD3d 190, 192-193 [2007], *lv denied* 10 NY3d 935 [2008]; *People v Bowman*, 48 AD3d 178, 183-186 [2007], *lv denied* 10 NY3d 808 [2008]; *People v Ford*, 43 AD3d 571, 573-574 [2007], *supra*). Specifically, the foregoing evinces that "defendant—acting with a conscious objective not to kill but to harm—

engage[d] in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" and then abandoned that "helpless and vulnerable victim in circumstances where the victim [was] highly likely to die" (*People v Suarez*, 6 NY3d 202, 212 [2005], *supra*). Further, "weigh[ing] the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" in light of the elements of the crime as charged (*People v Bleakley*, 69 NY2d at 495 [internal quotation marks and citation omitted]; *see People v Danielson*, 9 NY3d 342, 349 [2007]), the verdict finding depraved indifference murder was not against the weight of the evidence (*see People v Varmette*, 70 AD3d at 1171; *People v Baker*, 58 AD3d 1069, 1071 [2009], *affd* 14 NY3d 266 [2010]; *People v Smith*, 41 AD3d 964, 966-967 [2007], *lv denied* 9 NY3d 881 [2007]).

Turning to defendant's challenges to her conviction of felony murder, we note that she failed to preserve her contention that the evidence is legally insufficient to support the verdict on that charge (*see e.g. People v Hawkins*, 11 NY3d 484, 492 [2008]; *People v Gray*, 86 NY2d 10, 19 [1995]). Defendant further claims, however, that the verdict was against the weight of the evidence—an argument that does not require preservation (*see People v Danielson*, 9 NY3d at 348). As we have noted, "[a] felony murder is committed when a person, acting alone or in concert with others, commits or attempts to commit one of [10] enumerated felonies (including [aggravated sexual abuse]) and 'in the course of and in furtherance of such crime or of immediate flight therefrom, [he or she] . . . causes the death of a person other than one of the participants' " (*People v Stokes*, 88 NY2d 618, 623 [1996], quoting Penal Law § 125.25 [3]; *see People v Hernandez*, 82 NY2d 309, 317-318 [1993]). In light of the parents' testimony regarding the child's lack of injuries prior to arriving at defendant's residence, the medical testimony regarding the puncture wounds and tears to the child's vaginal area received within 24 hours of examination and that sexual abuse was a factor in the child's death, and defendant's admission that the child was bleeding from her genital area when defendant removed her from the tub, we conclude that the evidence established that defendant committed or attempted to commit aggravated sexual abuse in the second degree (*see* Penal Law § 130.67 [1] [c]) and, in the course of and in furtherance of that crime, caused the child's death.[2]

Defendant's remaining arguments do not require extended

---

2. County Court instructed the jury to consider the aggravated sexual abuse charge only if it found defendant not guilty of murder and, thus, the

discussion. There is no merit to defendant's contention that County Court erred in refusing to suppress her statements to police as involuntarily made. The statements were obtained after defendant voluntarily waived her *Miranda* rights. Although defendant testified at the suppression hearing that she was in pain during the interview because she had "shot heroin" the previous day and was experiencing withdrawal, we note that defendant was offered refreshments, a smoking break and an opportunity to secure her pain medication during the interview. Moreover, the testimony at the suppression hearing—insofar as found credible by County Court—established that defendant was not under arrest and did not unequivocally invoke her right to counsel or request that the interview terminate. "Given the totality of these circumstances, including . . . the absence of any evidence that [the questioning] was done in an unduly coercive or threatening manner, we are unpersuaded that the police conduct was such as to overbear . . . defendant's will or to undermin[e] [her] ability to make a choice whether or not to make a statement" (*People v Pouliot*, 64 AD3d 1043, 1045-1046 [2009], *lv denied* 13 NY3d 838 [2009] [internal quotation marks and citations omitted]; *see* CPL 60.45 [2] [a]; *People v Velez*, 70 AD3d 1191, 1192 [2010]; *People v Horton*, 46 AD3d 1225, 1226-1227 [2007], *lv denied* 10 NY3d 766 [2008]; *People v Ogburn*, 46 AD3d 1018, 1019 [2007], *lv denied* 10 NY3d 769 [2008]).

Finally, County Court properly admitted autopsy photographs depicting the location and extent of the child's head injuries inasmuch as they corroborated Jumbelic's testimony regarding the cause of death, manner in which the injuries were inflicted and the level of force used (*see People v Ford*, 43 AD3d at 574; *see also People v Wood*, 79 NY2d 958, 960-961 [1992]; *People v Stevens*, 76 NY2d 833, 835-836 [1990]). Defendant failed to preserve her assertions regarding the prosecutor's alleged improper remarks during summation and County Court's instructions to the jury with respect to felony murder; her remaining arguments—including her assertion that her sentence was harsh and excessive—have been considered and found to be lacking in merit.

Cardona, P.J., Spain, Kavanagh and Garry, JJ., concur. Ordered that the judgment is affirmed.

---

jury never reached that charge. We note that it has long been "settled that a felony murder conviction may stand even if the underlying felony which serves as its predicate is not submitted to the jury or if the underlying felony has been dismissed" (*People v Wroblewski*, 109 AD3d 39, 44 [1985] [citation omitted], *affd on op of Hancock, J.*, 67 NY2d 933, 935 [1986], *cert denied* 479 US 845 [1986]; *see People v Stokes*, 88 NY2d at 621, 625-626).