◼ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MELISSA A. McLAIN, Appellant. [915 NYS2d 362]—

Spain, J.P. Appeal from a judgment of the County Court of Broome County (Smith, J.), rendered January 9, 2009, upon a verdict convicting defendant of the crimes of murder in the second degree, manslaughter in the first degree and manslaughter in the second degree.

On October 19, 2007, defendant called 911 around 9:00 A.M. from her apartment in the Village of Endicott, Broome County, and her two-year-old son, who was unresponsive and comatose, was thereafter taken by ambulance to the hospital. He had substantial fresh (and older) bruises all over his face, head, chest, abdomen, back and legs and had sustained massive, severe traumatic brain injuries and swelling which left him with no brain activity. Hours later, he was transported to a pediatric intensive care unit at a medical center in the City of Syracuse, Onondaga County. He was declared brain dead, removed from life support and died on October 22, 2007. Based upon subsequent autopsies, it was estimated that the injuries had been sustained between 7:30 P.M. and 10:30 P.M. on October 18, 2007, the evening preceding the 911 call.

Defendant was charged in an indictment with depraved indifference murder and manslaughter in the first and second degrees, alleging that she had assaulted her son and failed to seek prompt medical treatment, causing his death. At trial, it was established that defendant was home alone with the child from approximately 3:30 P.M. until 9:00 P.M. on October 18, 2007. For two time intervals of one hour or less, at approximately 2:00 P.M. and 9:30 P.M., she went shopping and left the child at home alone with her live-in boyfriend, Tommy Manan. Both Manan and defendant testified, denying responsibility for, or awareness of, the fatal injuries prior to waking up on October 19, 2007. A jury found defendant guilty as charged, rejecting her defense that Manan was responsible for the child's injuries and death. Sentenced to a prison term of 22 years to life, defendant now appeals.

Defendant argues on appeal that the evidence was legally

insufficient to establish that she, rather than Manan, inflicted the fatal injuries to her son or that she acted with the requisite mens rea of depraved indifference to human life.[1] Also, she challenges the jury's verdict as contrary to the weight of credible evidence. We reject defendant's claims, and affirm.

The key disputed question at trial was who inflicted the child's fatal injuries on the evening of October 18, 2007. It was uncontroverted that only defendant and Manan were alone with the child that day, both denied inflicting the injuries or observing the other doing so, and there were no eyewitnesses to, or direct evidence of, the assault. Viewing the compelling circumstantial evidence in the light most favorable to the People, however, "there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (*People v Acosta*, 80 NY2d 665, 672 [1993] [internal quotation marks and citation omitted]; *see People v Bleakley*, 69 NY2d 490, 495 [1987]), including defendant's identity as the perpetrator of the child's fatal injuries.

To begin, Manan—who was never charged with any involvement—testified, denying hitting or slapping the child in the head or body that day (or ever); the jury clearly credited Manan's testimony, as was its province having observed his demeanor firsthand. Numerous witnesses testified to their contact with defendant, Manan and the child at the apartment during the week prior to this assault, including observations of a variety of bruises of different ages and severity. Defendant provided many different explanations, both before and after the child received emergency medical treatment, as to the causes of the bruises. On Wednesday, October 17, 2007, a Child Protective Services investigator made an unannounced visit to defendant's apartment and observed brown, older[2] bruises to the child's cheek and temple, which defendant attributed to him falling days earlier and to another child hitting him. The child was walking and eating and appeared fine. Defendant gave a similar account to a friend who spent most of that day at the apartment and observed the child warmly greet Manan upon his return.

---

1. Depraved indifference murder, as defined in Penal Law § 125.25 (4), is established by proof that, "[u]nder circumstances evincing a depraved indifference to human life, and being [18] years old or more[,] the defendant recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than [11] years old and thereby causes the death of such person."

2. The medical testimony established that purple bruises indicate fresh and recent injuries, and that, as a bruise ages, it turns black and blue, then brownish, then yellow-brown, and then yellow-green.

On Thursday, October 18, 2007, Jolene Barrett, defendant's friend, visited the apartment at around 2:00 P.M. She observed green colored, older bruises on the child's cheek, which defendant said were caused by the child jumping on furniture and a closet bar falling on him. Barrett testified that the child was acting normally and playing. When Manan came home, Barrett and defendant went shopping, leaving the child with Manan for about one hour, from 2:30 P.M. to 3:30 P.M. Manan testified that he played games with the child and, after defendant came home, he went out and did not return until 9:00 P.M. to 9:30 P.M., leaving defendant alone with the child. Defendant testified that, upon her return home around 3:30 P.M., the child had only a minor rug burn on his chin, but no other new injuries. Barrett spoke with defendant by telephone around 7:30 P.M., and defendant confirmed that Manan was still out and that she was alone with the child. Between 8:00 P.M. and 9:00 P.M., defendant's friend, Lucille Rotger visited the apartment while Manan was still out. Critically, she saw the child lying on the couch face down, very quiet, with his hands in his face. When he raised his head, Rotger observed that his face was swollen and he had bruises on his forehead, both cheeks and his face, temple-to-chin, and they were purple, which medical testimony established were fresh or newer bruises. At trial, defendant denied that the child was in that condition. When asked by Rotger about the bruising, defendant again attributed these new injuries to a fall and another child hitting him. The child was able to walk, but did not play with Rotger's kids.

Defendant then went grocery shopping with Rotger, leaving the child alone with Manan for about 45 minutes. Manan testified that he played with the child and then gave him Tylenol and put him to bed after the child said his head hurt. Defendant returned home around 8:45 P.M. to 9:45 P.M. and, according to Manan, she became "really, really mad" when he indicated that he would be going out again; upon his return 45 minutes later, defendant was calm and acted "strange." The child was asleep and they went to bed. Manan testified that the next morning he found the child lying in bed with labored breathing, covered in bruises and unresponsive; he alerted defendant, who called 911. During that call, defendant became angry at the dispatcher for asking "too many f . . . ing questions" and threw the phone and got dressed; Manan continued the emergency call. On the way to the hospital, defendant rode in the front of the ambulance, having been told that she could not sit in back with her son; she asked no questions and did not look back at him.

When interviewed by police, defendant initially falsely stated

that she, Manan and the child were home all evening on October 18, 2007. Hours later, she told police that she went to the grocery store around 8:30 P.M. to 9:30 P.M. and, upon her return, the child's behavior had changed; the child told her that Manan had hit him and his head hurt, so she gave him Tylenol and laid down in bed with him. When questioned in Syracuse—after *Miranda* warnings and after speaking with her own mother, who indicated disbelief in the innocent explanations for the child's grave condition—defendant implicated Manan for the first time. Defendant then signed a statement indicating that when she returned from the grocery store, the child said his head hurt, Manan had given him Tylenol, and she laid down with him. She did not report that the child had claimed that Manan had hit him that night, but stated that the child made that claim the day before, and she had gotten the days confused. At trial, defendant testified that, upon her return from the grocery store, the child was sleeping and Manan told her he had given him Tylenol for a headache. Defendant testified that, after Manan left, she went in and laid down with him in his bedroom, which was "very dark," and he told her his head hurt and asked her not to leave. He was breathing fine, and she left him and waited for Manan to come home. Defendant also attested that the child did not tell her that night that Manan had hit him, although she told this to friends at the hospital.

Aside from defendant's differing accounts to friends regarding the causes of the child's bruises during that last week of his life, several witnesses testified that defendant declined to take the child out of the apartment that week or to daycare because she did not want his bruises to be seen. On the day the child was taken to the hospital, defendant gave emergency responders, medical providers and family and friends conflicting accounts of what she found upon her return from the store the night before, sometimes saying that the child was bruised and that he told her that Manan had hit him and other times saying that he was asleep and she did not observe any injuries. While several of defendant's friends testified, as did Manan, that they had never seen her abuse or beat the child or hit him in the head, both Jennifer Chilson, a woman with whom defendant and the child lived in the summer of 2007, and Chilson's brother testified to observing defendant strike the child in the back, legs and head several times a day with "full force," causing bruises to his back and legs. Chilson also testified that defendant regularly called the child profane names and swore at him. During one incident, Chilson and her brother told defendant to stop when she was beating the child on the back and, in response, defendant threw the child down on the floor and left; they

observed extensive bruises down his back and legs, and Chilson later reported this to Child Protective Services. An off-duty Broome County Sheriff's Deputy who had observed defendant with the child at a medical clinic in August 2007 testified that defendant behaved angrily toward the child, repeatedly cursed at him and threatened to "beat [his] ass" and forcefully pushed him in the stroller when he tried to get up.

Viewing the foregoing evidence in the light most favorable to the prosecution, legally sufficient evidence existed to sustain the jury's verdict finding that defendant had inflicted the child's fatal injuries and failed to get prompt medical help (*see People v Varmette*, 70 AD3d 1167, 1169-1171 [2010], *lv denied* 14 NY3d 845 [2010]). Assuming that a different verdict would not have been unreasonable, the verdict was not against the weight of the credible evidence (*see id.* at 1171; *see also People v Bleakley*, 69 NY2d at 495). "[W]eigh[ing] the relative probative force of [the] conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (*People v Bleakley*, 69 NY2d at 495), the credible evidence overwhelmingly pointed toward defendant as the perpetrator. Other than defendant's unsubstantiated allegations implicating Manan because he was a boxer, which the jury rationally rejected given defendant's many inconsistent accounts, there was no credible evidence suggestive of Manan's guilt. By her own admission at trial, she had nearly exclusive access to the child on October 18, 2007 and did not even claim to have observed the extensive injuries to the child after his two short intervals alone with Manan that day.[3] Barrett's testimony as to the child's normal condition at 2:00 P.M. that day and Rotger's testimony as to the child's injured condition upon arrival at the apartment at 8:00 P.M. or 9:00 P.M. when he was alone with defendant strongly support the conclusion that at least some or all of the fresh bruises and injuries had been inflicted by defendant in recent hours, while Manan was out. Further supported is the likelihood that defendant inflicted further injuries after Manan went out for the last time around 10:00 P.M. In our view, the jury gave the evidence, including defendant's testimony and proof, the weight it deserved and, according great deference to its credibility determinations, we find that the verdict was not contrary to the weight of credible evidence.

---

**3.** While defendant claimed that Manan was "in and out" that day between 3:30 P.M. and 9:00 P.M., and he was not gone that entire time, as he had testified, she conceded that she never left the apartment or slept during that time. It was undisputed that Manan was only *alone* with the child for about one hour in the afternoon (2:30 P.M. to 3:30 P.M.) and another 45 minutes that evening sometime around 9:30 P.M.

We are similarly unpersuaded by defendant's further argument that the jury's conclusion that she acted with depraved indifference was not supported by legally sufficient evidence or was contrary to the weight of credible evidence. Under now established precedent, " 'depraved indifference to human life' is a culpable mental state" that "can, like any other mens rea, be proved by circumstantial evidence" (*People v Feingold*, 7 NY3d 288, 296 [2006]; *accord People v Manos*, 73 AD3d 1333, 1334 [2010], *lv denied* 15 NY3d 807 [2010]; *People v Varmette*, 70 AD3d at 1168-1169). While not ordinarily present in a one-on-one killing, depraved indifference may be established where, as here, defendant's actions are directed at a particular victim and are "marked by uncommon brutality" (*People v Payne*, 3 NY3d 266, 271 [2004]), i.e., in those rare cases in which the facts surrounding the murder "reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target" (*People v Suarez*, 6 NY3d 202, 213 [2005]; *see People v Manos*, 73 AD3d at 1335; *People v Ford*, 43 AD3d 571, 573 [2007], *lv denied* 9 NY3d 1033 [2008]).

The medical testimony established that the child had severe brain swelling or subdural hemorrhaging that cut off all blood supply to his brain and caused the "destruction of almost the entire brain." The director of the pediatric intensive care unit at the Syracuse hospital concluded, as did all of the medical providers and medical examiners who performed the autopsies, that the child's injuries were inconsistent with a fall at ground level or an accident. Robert Stoppacher, the medical examiner who performed the autopsy of the child's body, concluded that the cause of death was the blunt force injuries caused by an estimated 10 or more blows to the head. In addition to the multiple fresh bruises all over the child's head and body, he had severe bilateral retinal hemorrhaging caused by significant force, a rib fracture and a damaged lung. Stoppacher and Christine Fuller, the neuropathologist who performed the brain autopsy, concluded that the subdural hemorrhaging was caused by very forceful repeated head blows or by violent shaking. The foregoing overwhelmingly established that defendant acted with the requisite depraved indifference, i.e., with "uncommon brutality" (*People v Payne*, 3 NY3d 266, 271 [2004]), toward her child in that she engaged in a "brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (*People v Suarez*, 6 NY3d at 212; *accord People v Manos*, 73 AD3d at 1335).

Defendant's remaining claims lack merit.

Lahtinen, Kavanagh, Stein and Garry, JJ., concur. Ordered that the judgment is affirmed.