Respondent's application is granted and he is ordered reinstated, effective immediately.

Mercure, A.P.J., Peters, Rose, Lahtinen and Spain, JJ., concur. Ordered that respondent's application is granted; and it is further ordered that respondent is reinstated as an attorney and counselor-at-law in the State of New York, effective immediately.

■ In the Matter of ATTORNEYS IN VIOLATION OF JUDICIARY LAW § 468-A. COMMITTEE ON PROFESSIONAL STANDARDS, Petitioner; ROBERT O. OMOYENI, Respondent. [939 NYS2d 890]—

Per Curiam. Respondent, who was admitted to practice by this Court in 1996, was suspended by this Court's order dated September 24, 2009 for failure to comply with the attorney registration requirements of Judiciary Law § 468-a (*Matter of Attorneys in Violation of Judiciary Law § 468-a*, 65 AD3d 1447 [2009]).

Respondent now requests reinstatement on the ground that he has complied with the attorney registration requirements of Judiciary Law § 468-a and the Rules of the Chief Administrator of the Courts (*see* 22 NYCRR part 118). Petitioner does not object to respondent's application.

Respondent's application is granted and he is ordered reinstated, effective immediately.

Mercure, A.P.J., Peters, Rose, Lahtinen and Spain, JJ., concur. Ordered that respondent's application is granted; and it is further ordered that respondent is reinstated as an attorney and counselor-at-law in the State of New York, effective immediately.

(March 22, 2012)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ADRIAN P. THOMAS, Appellant. [941 NYS2d 722]—

Spain, J.P. Appeal from a judgment of the County Court of Rensselaer County (Ceresia, J.), rendered November 12, 2009, upon a verdict convicting defendant of the crime of murder in the second degree.

On Sunday, September 21, 2008, defendant's wife, Wilhemina Hicks, woke around 9:00 A.M. in their two-bedroom apartment in the City of Troy, Rensselaer County to find that their four-month-old son Matthew was unresponsive and not breathing regularly; she awoke defendant, 911 was called and emergency personnel responded. Upon arrival at a local hospital with Hicks, Matthew was in critical condition, in severe respiratory distress, unconscious and nonresponsive, and placed on a ventilator and antibiotics; blood tests later showed that he had streptococcal pneumonia, a bacterial infection. The infant was transferred to the pediatric intensive care unit of Albany Medical Center Hospital (hereinafter AMCH), where he arrived unresponsive, with very little brain activity or neurological functions, and was not adequately breathing on his own. A CAT scan disclosed what treating physicians determined to be subdural hematomas on both sides of his brain consistent with severe head trauma resulting from rapid acceleration and then sudden deceleration of the head, causing the brain to move back and forth inside the skull. Matthew also exhibited signs of sepsis, an overwhelming systemic infection. Shortly after his arrival at AMCH, despite extensive medical intervention, it was determined that Matthew was brain dead; two days later he was removed from life support and died.

Defendant remained at the apartment with the couple's six other children, all under nine years old, including Matthew's twin brother. That evening City of Troy police detectives accompanied Rensselaer County Child Protective Services (hereinafter CPS) caseworkers to the apartment where they briefly questioned defendant and CPS removed the children, leaving defendant alone. Interviewed by detectives hours later and again the next evening at length, defendant ultimately confessed that he had thrown Matthew onto a mattress and box spring located—without a bedframe—directly on the floor in defendant's bedroom, three times in the four days preceding the 911 call. Defendant also admitted that he had unintentionally hit the infant's head against the side of his crib several times, including after the 911 call. The police interviews were recorded on DVDs, which captured defendant, self-described at 500 pounds, demonstrating how he had forcefully thrown the infant to the mat-

tress. Defendant signed two statements that reflected essential parts of his admissions during each interview. It was also established that Matthew, who weighed just 15 pounds and had been born two months premature, had been ill and experiencing fevers, diarrhea and vomiting in the days preceding his death.

Defendant was indicted on one count of depraved indifference murder and, at trial, Hicks testified, denying harming Matthew. A plethora of highly credentialed medical subspecialists were called by both sides, offering two sharply conflicting opinions regarding the primary cause of death. The People's experts, including the pediatric critical care supervisor and pediatric neurosurgeon who treated Matthew at AMCH and the forensic pathologist who performed the autopsy, all testified that the cause of death was the subdural hematomas or brain swelling and bleeding caused by severe blunt force head trauma, and that sepsis and pneumonia were secondary contributing factors, but not the sole cause. Defendant's experts, by contrast, concluded that sepsis leading to meningitis and septic shock and not head trauma was the cause of death. Whereas the pediatric critical care physician who treated Matthew opined that defendant's admitted actions in throwing a four month old with considerable force onto a mattress and box spring—the surface of which was located 17 inches above the floor—several times in four days is the type of rapid acceleration-deceleration that could cause the severe head trauma and subdural hematomas found in Matthew, the neuropathologist who testified on behalf of the defense opined that such an injury would "probably not" result from such actions. Defendant, in his trial testimony, disavowed his confession as coerced and false, and denied throwing Matthew or hitting his head against the crib.

After a jury trial, at which the jury viewed a redacted video version of most of defendant's interviews with police, defendant was convicted of depraved indifference murder and sentenced to a prison term of 25 years to life. Defendant now appeals.

Initially, defendant argues that his oral and written statements to police should have been suppressed on the grounds that they were involuntarily obtained and the product of coercive custodial interrogation methods, which included false promises, misrepresentations and threats. After a hearing, County Court denied defendant's suppression motion finding that the statements had been voluntarily made in a noncustodial setting in which police did not employ impermissible coercive tactics.

The voluntariness of defendant's statements is evaluated by looking at the totality of the circumstances in which they were

obtained (*see People v Anderson*, 42 NY2d 35, 38 [1977]; *see also People v Mateo*, 2 NY3d 383, 413-414 [2004], *cert denied* 542 US 946 [2004]; *People v Pouliot*, 64 AD3d 1043, 1044 [2009], *lv denied* 13 NY3d 838 [2009]), guided by the axiom that deceptive police strategies in securing a confession "need not result in [a finding of] involuntariness without some showing that the deception was so fundamentally unfair as to deny due process or that a promise or threat was made that could induce a *false* confession" (*People v Tarsia*, 50 NY2d 1, 11 [1980] [emphasis added; citations omitted]; *see People v Mateo*, 2 NY2d at 413; *People v Tankleff*, 84 NY2d 992, 994 [1994]; *People v Munck*, 92 AD3d 63, 68 [2011]; *People v Dishaw*, 30 AD3d 689, 690 [2006], *lv denied* 7 NY3d 787 [2006]; *see also* CPL 60.45 [2] [b] [i]). Upon our review of the unredacted recorded interviews and the *Huntley* testimony, we find that defendant—who did not testify at the hearing—voluntarily confessed during noncustodial interviews in which police employed permissible strategies aimed at eliciting the truth of what had occurred leading up to Matthew's death.

According to the police officers who testified, defendant was interviewed by police on two separate occasions: for about two hours beginning around midnight on Sunday, September 21, 2008, and the next day, Monday, for approximately seven hours—from around 6:00 P.M. until 1:00 A.M. on Tuesday, when he was arrested. On Sunday, after the other children were removed by CPS, the officers told defendant that they would be in touch and left him alone. Hours later, around midnight, Detectives Adam Mason and Ronald Fountain, who had been to AMCH, returned to defendant's apartment; he was awake and agreed to accompany them to the police station to discuss the incident. At the outset of the first interview, Mason read defendant each individual *Miranda* warning, some of which he explained at defendant's request, and he was advised that he was not under arrest and could stop questioning at any time; defendant indicated that he understood, signing a waiver after they had him read the document aloud to ascertain his reading ability. Defendant was questioned by Mason and Fountain for two hours in an unlocked interview room, during which he was apprised that Matthew was not expected to live and that doctors suspected that Matthew had been slammed into something,[1] and they suggested, among other things, that someone might have bumped the infant's head against the crib. Defendant denied any wrongdoing or knowledge of anyone harming Mat-

---

1. Although doctors at the Troy hospital initially reported that Matthew had a skull fracture, doctors at AMCH later ruled that out.

thew, and he reviewed and signed a one-page witness statement to that effect; officers indicated that they would want to speak with him again the next day, and defendant agreed. When defendant expressed suicidal thoughts, i.e., that he might jump off a bridge if Matthew were to die, he was immediately offered an opportunity to speak with a counselor which, after some discussion,[2] he accepted, and he was then transported to the mental health unit of a local hospital around 2:00 A.M. (see Mental Hygiene Law § 9.41).

After about 15 hours of mental health observation—a significant break in police questioning—it was determined that defendant was not a danger to himself and he was discharged around 5:45 P.M. on Monday; upon his release, he asked the discharge nurse if it would be okay to wait there for the detectives who would be coming to speak with him, supporting the conclusion that he wanted to speak with them. The testimony and records of that evaluation demonstrate that defendant was somewhat depressed, preoccupied and anxious, but do not suggest that he was incapable of making voluntary and knowing choices, such as whether to speak with police, or that he was unable to fully understand and invoke his rights.

As defendant exited the mental health unit, Mason, accompanied by another detective, approached and defendant agreed to go back with them to the station for questioning. Defendant was transported and placed in the same unlocked interview room at approximately 6:00 P.M. where he was again advised of and waived his *Miranda* rights—after indicating he understood them—and he was told he was not under arrest and could stop questioning at any time; he agreed to answer questions. Mason continued with investigatory questions centered on the cause of Matthew's condition, exploring a vast array of scenarios over the next six hours which defendant denied, including throwing Matthew or causing him injury. Mason's nonthreatening, nonhostile strategy focused on gaining defendant's trust and assuring him that he believed that whatever had caused Matthew's injuries had been accidental; Mason encouraged defendant to disclose the truth about what had occurred in order to assist the doctors in saving Matthew's life, although Mason had been advised at that point that Matthew would not survive. Defendant signed the first part of his second statement, consisting of six pages in which he made admissions of how he

---

**2.** Defendant himself thereafter continued to initiate further conversation about what may have caused Matthew's injuries and what transpired in the days leading up to the 911 call, appearing eager to continue speaking despite those suicidal thoughts.

might have accidentally caused the injuries.[3] Thereafter, another detective briefly entered the interview room and challenged defendant in a raised voice that his account was not consistent with the X rays and the doctors' opinions. He accused defendant of slamming him against something and of lying; defendant again denied any wrongdoing. The detective exited and Mason responded with the ruse that he felt betrayed by defendant's dishonesty and that he was defendant's last ally; Mason pressed defendant more forcefully for the truth, suggesting possible scenarios, including that he threw the infant, demonstrating how this might have occurred. This was the turning point of the interview.

Defendant then admitted in increasing detail having thrown the child in frustration onto the bed forcefully, three times, in the four days preceding the 911 call, after he had arguments with Hicks[4] over his lack of a job; defendant demonstrated how he had done so using Mason's briefcase binder, which he ultimately raised above his shoulders and slammed to the ground with considerable force. After a break during which he was left alone, defendant confirmed that this account of repeatedly throwing the infant on the bed was accurate; four pages were added to the second statement summarizing these admissions, and he reviewed it by himself and signed it.

Initially, the *Huntley* transcript and recorded interviews fully support County Court's factual determination that defendant voluntarily accompanied the officers to the station for questioning on both occasions and waived his *Miranda* rights each time. No questioning occurred outside the interview room, and the questioning was (until the last segment of the second interview) investigatory; defendant's statements were the product of permissible police tactics and were not coerced, and defendant was not in custody, as a reasonable person in his position, innocent of any wrongdoing, would have believed that he or she was free to leave (*see People v Paulman*, 5 NY3d 122, 129 [2005]). The video confirms that defendant was never—at any time—handcuffed or restrained, frisked or placed under arrest,

---

**3.** These admissions included that 10 to 15 days earlier he had accidentally dropped Matthew in his crib, causing his head to hit the side of the crib; that the day before the 911 call, he had laid back in bed where Matthew was laying, and accidentally struck his head against Matthew's head, which caused breathing problems that persisted until the following morning when Hicks found him unresponsive; and that in the ensuing panic after the 911 call, he had again accidentally dropped Matthew into his crib, causing him to hit his head hard against the crib.

**4.** Defendant never implicated Hicks or suggested that she knew Matthew had been injured.

physically or verbally abused, threatened or mistreated; he was not told he had to remain or prevented from leaving. He was repeatedly offered food, beverages and bathroom breaks, which he declined, and his numerous requests for cigarettes were honored. Defendant, who retained his cell phone, never asked to make a phone call, for an attorney, to leave, to end questioning or take a break, to go home or to the hospital, or to sleep or rest. The interview room was a relatively bare room with two or three chairs and a small table; the second interview consisted of defendant sitting in a chair, while a seated Mason questioned him mostly in a calm, often friendly and supportive manner; when defendant became upset and cried a few times, Mason comforted him. He was left alone in the room many times, did not object to or resist the ongoing questioning or appear anxious to leave or afraid of police, and remained cooperative, alert and eager to eliminate himself as a potential perpetrator; he did not appear to be either overly fatigued or particularly distraught beyond a few brief episodes of crying.

While defendant was likely not free to leave once he admitted repeatedly throwing Matthew, police had probable cause to continue to detain him and were not required to repeat *Miranda* warnings, given his valid waiver of those rights at the outset of that interview (*see People v Davis*, 72 AD3d 1206, 1207-1208 [2010], *lv denied* 15 NY3d 803 [2010]; *People v Westervelt*, 47 AD3d 969, 972 [2008], *lv denied* 10 NY3d 818 [2008]; *People v Maddox*, 31 AD3d 970, 973-974 [2006], *lv denied* 7 NY3d 868 [2006]). Thus, his confession was likewise not the product of an illegal arrest. While defendant focuses on the length of the interviews to argue that he was in custody the entire time, we disagree, as "[e]ven an interview of extended duration at a police station is not necessarily a custodial interrogation" (*People v Centano*, 153 AD2d 494, 495 [1989], *affd* 76 NY2d 837 [1990]; *see People v Hernandez*, 25 AD3d 377, 378 [2006], *lv denied* 6 NY3d 834 [2006]). Considering all of the relevant factors (*see People v Johnston*, 273 AD2d 514, 515 [2000], *lv denied* 95 NY2d 935 [2000]), using a reasonable person standard (*see People v Paulman*, 5 NY3d at 129), the record supports the finding that defendant was not in custody until he incriminated himself (*see People v Pouliot*, 64 AD3d at 1046). As the *Miranda* safeguards were knowingly and voluntarily waived, no violation of defendant's rights occurred and his statements were admissible (*see People v Culver*, 69 AD3d 976, 977 [2010]).

We reject defendant's claim that questioning should have ceased on the premise that he invoked his right to counsel during the second interview (*see People v West*, 81 NY2d 370, 373-

374 [1993]). A review of the interview itself fully supports County Court's conclusion that defendant's inquiry regarding whether he would need an attorney referred to a pending Family Court matter and not to the present matter. Defendant was not yet in custody (*see id.*), and his inquiry did not constitute the "unequivocal invocation" required for that right to attach, so as to compel an end to further questioning in the absence of an attorney, because "a query as to whether counsel ought to be obtained will not suffice" (*People v Mitchell*, 2 NY3d 272, 276 [2004], citing *People v Hicks*, 69 NY2d 969, 970 [1987]; *see People v Culver*, 69 AD3d at 977-978). Thus, defendant was not entitled to suppression on this ground (*see People v Mayo*, 19 AD3d 710, 711 [2005]).

On the issue of the voluntariness of defendant's statements and his extensive claims of coercive police tactics, promises and threats, looking at all of the foregoing circumstances under which they were obtained (*see People v Mateo*, 2 NY3d at 413), we agree that the People satisfied their burden of demonstrating beyond a reasonable doubt that his statements were voluntary (*see People v Rosa*, 65 NY2d 380, 386 [1985]).[5] The circumstances and atmosphere of the interviews fail to demonstrate involuntariness. While the interviews were lengthy, two hours and seven hours, a factor on which defendant places great emphasis, they were separated by a 15-hour break in questioning during which defendant had a bed and food and ample opportunities to rest, sleep, make phone calls, eat, contemplate and consult help. While defendant argues that the proof established that he was awake almost 40 hours, i.e., from the Sunday 9:00 A.M. 911 call until his Tuesday 1:00 A.M. arrest, with less than two hours of sleep at the mental health unit, the suppression testimony did not support that conclusion.[6]

More importantly, the recorded interviews simply do not sup-

---

**5.** Defendant's claim that suppression should have been granted because his confession was proven false by the defense's medical testimony at trial is fundamentally flawed. First, defendant cannot rely on *trial* testimony to establish entitlement to suppression (*see People v Millan*, 69 NY2d 514, 518 n 4 [1987]). Second, even if the jury had credited his trial experts' opinions that Matthew died of infection and not head trauma, this would not disprove defendant's admitted acts of throwing him on the bed.

**6.** The suppression testimony did not establish that defendant was deprived of sleep. The evidence shows that defendant slept for about one hour and 45 minutes at the mental health unit, and was checked on frequently, but did not account for all of his time there. It did not establish that any requests to sleep more were denied or that he was overly fatigued or emotionally distraught. Further, defendant had opportunities to sleep, including (1) after the Sunday 9:00 A.M. 911 call until the arrival of CPS at 6:00 P.M. (nine hours), (2) after the children were removed at approximately 7:00 P.M. until

port the conclusion that defendant was unduly fatigued or sleepy, or that he was physically or psychologically overwhelmed (*contrast People v Anderson*, 42 NY2d at 39-40 [the defendant interrogated without advisement of his rights by eight or nine officers operating in relay teams for 19 continuous hours and deprived of food, shaken awake when he dozed or nodded off, and was awake 30 hours without sleep by the time he confessed]). While lack of sleep or nourishment and the duration of station house interviews are certainly significant factors to be considered in evaluating voluntariness (*id.* at 40), on the record before us, "[w]ithout more, the length of time involved did not render the confession[ ] obtained during that period inadmissible" (*People v Tarsia*, 50 NY2d at 12-13 [test and interview lasted 11 hours]).

Also contrary to defendant's vehement claims, the strategies and tactics employed by the officers during these interviews were not of the character as to induce a false confession and were not so deceptive that they were fundamentally unfair and deprived him of due process (*see id.* at 11). The officers' repeated misrepresentation that defendant's truthfulness might enable doctors to effectively treat Matthew did not render his statements involuntary, because appealing to his parental concerns did not create a substantial risk that he might falsely incriminate himself (*see id.*; *People v Dishaw*, 30 AD3d at 690-691; *People v Henderson*, 4 AD3d 616, 617 [2004], *lv denied* 2 NY3d 800 [2004]). Indeed, common sense dictates the opposite conclusion, i.e., that parents, aware of their child's life threatening predicament, would *accurately* disclose any information that might enable doctors to save their child.

Likewise, Mason's persistent assurances, including that he believed that it had been an accident and that defendant would not be arrested or go to jail at that time (based upon information then available to police that did not yet connect defendant to this crime), were not improper promises of leniency that would induce a false confession (*see People v Lyons*, 4 AD3d 549, 552 [2004]; *People v Richardson*, 202 AD2d 958, 958-959 [1994], *lv denied* 83 NY2d 914 [1994]). Indeed, defendant had been advised that any admission to criminal conduct could be used against him in court; when defendant asked if he would be

---

the detectives returned at midnight (five hours), and (3) after his Monday 2:00 A.M. arrival at the hospital and his admission to the mental health unit at 6:00 A.M. (four hours). Thus, we find that the People proved the voluntariness of defendant's conduct and statements and disproved defendant's claim that sleep deprivation rendered them involuntary.

criminally prosecuted, Mason told him that he did not know and no promises could be made, but it would not happen "right now," which was true as he had not yet confessed.

Further, defendant's eventual confession that he had slammed the infant on the bed on three separate days in frustration, decidedly not accidental conduct, belies his claim that he succumbed to Mason's pressure and suggestions to attribute the infant's condition to accidental causes. Also untrue is that threats to arrest Hicks coerced defendant's confession. When defendant said he would "take the fall" for her to keep her out of jail, he was told he could not do so and should instead tell what he knew. The focus on Hicks' potential culpability was reasonable and did not overbear his will or coerce his subsequent confession some 19 hours later, or render it involuntary (*see People v Lyons*, 4 AD3d at 552; *cf. People v Keene*, 148 AD2d 977 [1989]). While we adhere to the constitutionally-mandated "steadfast refusal to countenance confessions obtained by [impermissibly] coercive means" (*People v Tarsia*, 50 NY2d at 10), the record fully supports County Court's finding that defendant's statements were voluntary and admissible.

Next, we find the jury's verdict convicting defendant of depraved indifference murder of a child pursuant to Penal Law § 125.25 (4) is supported by legally sufficient evidence and not against the weight of the credible evidence (*see People v Bleakley*, 69 NY2d 490, 495 [1987]). Viewing the evidence in the light most favorable to the prosecution, as we must in our legal sufficiency inquiry (*see People v Contes*, 60 NY2d 620, 621 [1983]), we conclude that the evidence, including defendant's recorded confession and the medical testimony, proved that defendant acted with the requisite mens rea of depraved indifference and established his guilt of depraved indifference murder of a child (*see People v Feingold*, 7 NY3d 288, 294 [2006]). The facts of this case fall within the limited class of one-on-one killings that still satisfy the depraved indifference standard (*see People v Suarez*, 6 NY3d 202, 210 [2005]; *People v Manos*, 73 AD3d 1333, 1334 [2010], *lv denied* 15 NY3d 807 [2010]; *People v Varmette*, 70 AD3d 1167, 1169 [2010], *lv denied* 14 NY3d 845 [2010]; *People v Ford*, 43 AD3d 571, 573 [2007], *lv denied* 9 NY3d 1033 [2008]). Depraved indifference may be demonstrated by circumstantial evidence (*see People v Snyder*, 91 AD3d 1206, 1211 [2012]), and defendant's actions here fall within one of the recognized rare factual patterns in which the unintentional killing of a single person constitutes depraved indifference murder, in that defendant " 'acting with a conscious objective not to kill but to

harm—engage[d] in torture or[7] a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim' " (*People v Taylor*, 15 NY3d 518, 523 [2010], quoting *People v Suarez*, 6 NY3d at 212).

His admitted conduct in repeatedly forcefully throwing his premature infant over the course of four days reflects just such depraved indifference, in that he acted with "an utter disregard for the value of human life" (*People v Suarez*, 6 NY3d at 214). Defendant was aware that Matthew had been sick during this ongoing brutality. His acts, born of anger and frustration, against a tiny, helpless infant behind closed doors, when he was responsible for his care, reflected "wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target" (*id.* at 213; *see People v Snyder*, 91 AD3d at 1211; *People v Manos*, 73 AD3d at 1334-1336). The People's medical testimony established that Matthew had sustained severe head trauma, causing his death, and that defendant's admitted conduct was capable of producing his catastrophic injuries. Defendant inflicted injury, ignored signs that the child was in distress (by defendant's account) and allowed him to slowly deteriorate, prolonging his suffering, until Hicks discovered him unresponsive, evincing depraved indifference (*see People v Suarez*, 6 NY3d at 212; *People v Manos*, 73 AD3d at 1337-1338; *People v Varmette*, 70 AD3d at 1171).

While defendant also argues that the evidence did not establish that he acted recklessly, we strongly disagree (*see* Penal Law § 15.05 [3]; § 125.25 [4]). In light of the medical testimony of the premature infant's extensive fatal injuries and the degree of force required to inflict them and defendant's admissions, the jury reasonably concluded that defendant, aware of an obvious risk of death or serious physical injury, acted recklessly (*see People v Varmette*, 70 AD3d at 1169; *People v Heslop*, 48 AD3d 190, 193 [2007], *lv denied* 10 NY3d 935 [2008]; *People v Ford*, 43 AD3d at 573; *People v Smith*, 41 AD3d 964, 966 [2007], *lv denied* 9 NY3d 881 [2007]; *People v Maddox*, 31 AD3d at 972). Further, we reject defendant's claim that his actions bespoke "an intentional [killing] or no other" (*People v Suarez*, 6 NY3d at 215 [internal quotation marks and citation omitted]) as unsupported by the evidence.

Turning to defendant's extensive challenge to the weight of

---

**7.** At defendant's request, the word "torture" was deleted from the jury charge on depraved indifference murder and we evaluate the sufficiency of the evidence in light of the charge as given, without objection (*see People v Ford*, 11 NY3d 875, 878 [2008]).

the evidence, while a different finding would not have been unreasonable—had the jury credited either the opinions of the defense's medical experts that Matthew died of sepsis infection or defendant's testimony that his confession was false and had been coerced—we cannot conclude that the verdict was contrary to the weight of the credible evidence (*see People v Bleakley*, 69 NY2d at 495). Weighing the relative probative force of the conflicting testimony, particularly the sharply divergent medical opinions on the cause of death and defendant's testimony repudiating his confession which contradicted that of the interviewing detective, and considering the relative strength of the inferences to be drawn from that conflicting testimony, we conclude that the jury gave the evidence the weight it should be accorded (*see id.*; *see also People v Danielson*, 9 NY3d 342, 348-349 [2007]; *People v Mateo*, 2 NY3d at 414-415). In so finding, "[g]reat deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor" (*People v Bleakley*, 69 NY2d at 495).

We have reviewed the extensive, conflicting medical testimony offered by the opposing medical experts—all highly experienced and credentialed subspecialists in their relevant fields—regarding the cause of death (head trauma versus systemic infection) and whether defendant's confessed actions could have produced serious head injuries. Notably, the jury observed the experts' testimony firsthand, including extensive and probing cross-examination challenging the bases for their conclusions, and we "cannot assign error in the trier of fact crediting the People's experts over that of defendant's experts" (*People v Strawbridge*, 299 AD2d 584, 593 [2002], *lv denied* 99 NY2d 632 [2003]). All of the experts offered compelling testimony, and the jury's task was difficult. However, the defense experts were not, as a factual matter, more qualified, persuasive or credible, and we cannot say that the jury erred in not finding their testimony more believable or persuasive. As for defendant's testimony denying throwing Matthew and disavowing his confession to police as false and coerced, the jury viewed the confession and was charged to evaluate witness credibility and the voluntariness of his statement, and we discern no basis upon which to overrule its implicit determination not to credit defendant's testimony or the defense's efforts to undermine his confession.

Next, we find no error in County Court's ruling, after a *Frye* hearing, denying defendant's request to permit expert testimony from a social psychologist on police interrogation tactics and false confessions. "The admissibility and bounds of expert testimony are addressed primarily to the sound discretion of the

trial court, . . . [which] in the first instance [must] determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness" (*People v Cronin*, 60 NY2d 430, 433 [1983] [citation omitted]). "The trial court's decision will not be disturbed absent a showing of serious mistake, error of law or abuse of discretion" (*People v Fish*, 235 AD2d 578, 580 [1997], *lv denied* 89 NY2d 1092 [1997] [citation omitted]; *see People v LeGrand*, 8 NY3d 449, 456-459 [2007]).

The record, including the hearing testimony of the People's expert, a law school professor expressly credited by County Court, fully supports the court's ruling that the psychologist's proffered testimony neither concerned a subject matter outside of the ken of the average juror, nor had the principles upon which the psychologist relied been established as accepted within the relevant scientific community (*see People v LeGrand*, 8 NY3d at 455-457; *People v Wernick*, 89 NY2d 111, 115 [1996]; *People v Wesley*, 83 NY2d 417, 422 [1994]; *People v Taylor*, 75 NY2d 277, 286-288 [1990]; *People v Shepard*, 259 AD2d 775, 777 [1999], *lv denied* 93 NY2d 979 [1999]). The court determined that current research fails to establish either a consensus connecting specific interrogation techniques to the occurrence of false confessions or a reliable basis for distinguishing false confessions from truthful ones. We agree with the court that the jury—having watched the videotaped interviews and defendant's trial testimony explaining why he had confessed falsely, as well as the defense's vigorous cross-examination of the interviewing officers, which fully exposed the tactics employed—was ''perfectly capable of assessing whether it believes that the [d]efendant's statements were true and accurate, or whether they were falsely made as a result of police tactics and coercion.'' Indeed, the court noted that the jury would be charged on voluntariness and the factors to evaluate in determining whether the confession was the result of undue pressure or improper conduct (*see* CJI2d[NY] Confession; CPL 60.45, 710.70 [3]), and the court in fact provided an expanded charge on this matter. Given the foregoing, we discern no abuse of discretion or error in the court's ruling.

Finally, defendant's remaining contentions for reversal similarly lack merit, including his claim that County Court violated the principles governing juror note taking and responses to juror requests for readbacks of the charge. We perceive no abuse of discretion in the court allowing jurors to take notes in this lengthy and difficult trial, and find that it gave appropriate

and repeated cautionary instructions (*see People v Hues*, 92 NY2d 413, 419 [1998]; *People v Strasser*, 249 AD2d 781, 782 [1998], *lv denied* 91 NY2d 1013 [1998]; *see also* 22 NYCRR 220.10 [c]).[8] The court responded meaningfully to the jury's numerous requests for readbacks and queries (*see People v Steinberg*, 79 NY2d 673, 684 [1992]; CPL 310.30), including rereading portions of the original charge (*see People v Santi*, 3 NY3d 234, 248-249 [2004]). Obliging jury requests to repeat portions of the charge or to speak more slowly was not tantamount to improperly giving the jury a copy of a statute or selected portions of the written charge (*see People v Tucker*, 77 NY2d 861, 862-863 [1991]; *People v Strasser*, 249 AD2d at 782-783; *cf. People v Johnson*, 81 NY2d 980, 981-982 [1993], *affg* 181 AD2d 103 [1992]; *People v Owens*, 69 NY2d 585, 590-591 [1987]).

Lahtinen, Malone Jr., Stein and Egan Jr., JJ., concur. Ordered that the judgment is affirmed.

---

8. We decline to review the jurors' notes (*see* 22 NYCRR 220.10 [e]).