[953 NYS2d 55]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PAUL AVENI, Appellant.

Second Department, October 17, 2012

230

## APPEARANCES OF COUNSEL

*John F. Ryan*, White Plains (*David B. Weisfuse* of counsel), for appellant.

*Janet DiFiore, District Attorney*, White Plains (*Raffaelina Gianfrancesco* and *Richard Longworth Hecht* of counsel), for respondent.

## OPINION OF THE COURT

BELEN, J.

This case presents us with an opportunity to decide under what circumstances the police, while interrogating a suspect, exceed permissible deception, such that a suspect's statements to the police must be suppressed because they were unconstitutionally coerced. During the early morning of January 13, 2009, the defendant, Paul Aveni, who had been arrested the previous night for violating a temporary order of protection obtained by his mother, Mary Aveni (hereinafter Mary), was intentionally deceived and threatened by two detectives from the New Rochelle Police Department into making various inculpatory statements. Knowing that the defendant's girlfriend, Angela Camillo, had died in Mary's home earlier the previous night, Detective Claudio Carpano intentionally deceived and threatened the defendant by telling him that Camillo was receiving medical treatment at a hospital and that "she's okay now but if you lie to me and don't tell me the truth now . . . it could be a problem" because medical personnel would be unable to properly treat Camillo and the defendant could be held responsible for her death.

Shortly thereafter, the defendant made inculpatory statements that he had procured heroin and had injected Camillo with the drug. The cause of Camillo's death was later determined to be acute mixed drug intoxication involving heroin, ecstasy, and Alprazolam, also known as Xanax.

After a jury trial, the defendant was convicted of burglary in the second degree, criminally negligent homicide, criminal injection of a narcotic drug, criminal contempt in the first degree, and criminal possession of a controlled substance in the seventh degree.

The defendant appeals from the judgment of conviction, arguing, among other things, that his statements to the police should have been suppressed because they were involuntarily made as a result of the deception and threats used by the detectives, and that his will was overborne by the length of the detention, lack

of food and water, his intoxication, and false promises made by the police. Furthermore, he contends, since his statements were thus rendered involuntary and, hence, inadmissible, there is legally insufficient evidence to support his convictions of burglary in the second degree, criminally negligent homicide, criminal injection of a narcotic drug, and criminal possession of a controlled substance in the seventh degree. He separately contends, on different grounds, that there is legally insufficient evidence to convict him of criminal contempt in the first degree and that the verdict of guilt with respect to that conviction was against the weight of the evidence.

We agree with the defendant that the statements he made to law enforcement officials at the police station must be suppressed, and that, therefore, his convictions of burglary in the second degree, criminally negligent homicide, criminal injection of a narcotic drug, and criminal possession of a controlled substance in the seventh degree must be vacated as unsupported by legally sufficient evidence, and those counts dismissed from the indictment. However, the defendant's challenge to the legal sufficiency of the evidence supporting his conviction of criminal contempt in the first degree is unpreserved, and, in any event, without merit, and the verdict of guilt with respect to that conviction was not against the weight of the evidence.

The principal issue presented in this case is whether the defendant's will was overborne, in violation of the United States Constitution and *Miranda v Arizona* (384 US 436 [1966]), the New York Constitution, and the Criminal Procedure Law, when he made inculpatory statements indicating that he had procured heroin and had injected Camillo with the drug. We further consider whether the defendant's conviction of burglary in the second degree was supported by legally sufficient evidence with regard to the elements of "enter[ing] . . . unlawfully," based upon the violation of an order of protection, and "intent to commit a crime therein" (Penal Law § 140.25), based upon the intent to commit the offense of criminal possession of a controlled substance in the seventh degree, as charged in the indictment and the bill of particulars.

The Supreme Court held a pretrial suppression hearing to determine the admissibility of, inter alia, the defendant's inculpatory statements made to the police (*see People v Huntley*, 15 NY2d 72 [1965]). During the hearing, the People presented the testimony of Detective Carpano, who testified that at approximately 11:30 p.m. on January 12, 2009, after advising the

defendant of his *Miranda* rights (*see Miranda v Arizona*, 384 US 436 [1966]), he interviewed the defendant at the New Rochelle police station. At that time, the defendant stated that he had seen Camillo earlier that day, but had dropped her off at a gas station, and had not seen her again until several hours later, after his brother contacted him and informed him that Camillo was in their mother Mary's home and under the influence of narcotics. When he arrived at Mary's home, he found Camillo unconscious in a chair in his old bedroom. After asking Mary to call 911, he left because there was an order of protection barring him from the home.

The defendant initially told Detective Carpano that some time later, the defendant returned to the house to check on Camillo's condition. The house appeared empty, and he fell asleep in his brother's bedroom. He awoke at approximately 11:15 p.m., fell out of bed, and heard a police officer instructing him to identify himself. According to the hearing testimony of two police officers, the defendant came down a stairway to a landing, was handcuffed by an officer, and was advised of his *Miranda* rights.

At approximately 2:00 a.m., Detective Carpano presented the defendant with a transcription of the above statement, which the defendant refused to sign.

More than four hours later, at approximately 6:30 a.m., the defendant, after again being advised of his *Miranda* rights, was interviewed again at the police station by Detective Carpano and another detective. During that interview, Detective Carpano, who knew that Camillo was dead, testified that he told the defendant,

> "[Camillo] was at the hospital and the doctors are working on her, but it's imperative; did she use any drugs or did she take anything, because whatever medications the doctors give her now could have an adverse effect on her medical condition. You—she's okay now but if you lie to me and don't tell me the truth now and they give her medication, it could be a problem."

Immediately thereafter, the defendant made an inculpatory statement that he had injected Camillo with heroin.

At approximately 7:00 a.m., Detective Carpano began videotaping the interview. During the recorded interview, the defendant stated that, before going to Mary's home, he had purchased

the heroin that he later injected into Camillo. Throughout the recorded interview, Detective Carpano continuously stated that Camillo was alive and that she had told the police she had been forced to take heroin, which contradicted the defendant's assertion that Camillo did so voluntarily. Further, when the defendant asked about the criminal contempt charge arising out of the violation of the order of protection, the detectives promised him, on numerous occasions, that they would help him with that matter if he was cooperative, although the District Attorney would ultimately decide how to proceed.

During her summation at the suppression hearing, defense counsel argued, inter alia, that the police acted improperly by deceiving the defendant into believing that Camillo was still alive and threatening him that his failure to tell them what drugs she had taken would make him responsible for her death.

At the conclusion of the suppression hearing, the hearing court, among other things, declined to suppress the statements made by the defendant at the police station.

The matter then proceeded to trial before a jury. As part of the People's case-in-chief, Camillo's mother testified that, prior to Camillo's relationship with the defendant, Camillo had dated and lived with another man who was a heroin addict. On January 11, 2009, the day before she died, Camillo told her mother that she was going out to lunch with the defendant.

The defendant's mother, Mary, testified that on January 12, 2009, at approximately 4:00 p.m., the defendant and Camillo entered her home, despite the temporary order of protection against the defendant barring him therefrom, and went to his second-floor bedroom. Previously, Mary had unsuccessfully attempted to have the order vacated or modified to allow the defendant to visit her home, and on this date, and on prior occasions, she allowed him to enter and stay in her home notwithstanding the order.

At approximately 8:45 p.m., the defendant told Mary that something was wrong with Camillo. Mary went into the bedroom and saw Camillo sitting in a chair with her legs crossed and her eyes open, looking straight ahead. At approximately 9:10 p.m., Mary called 911.

Meanwhile, the defendant's older brother, Eric Aveni (hereinafter Eric), was watching videos with a friend in a third-floor apartment in Mary's home. According to Eric, the defendant banged on the door and stated that there was something wrong

with Camillo. The defendant then grabbed a chair, stood on top of it, and climbed into a crawl space in the attic. Eric heard Mary scream from the second floor and went into the defendant's bedroom, where he found Camillo sitting upright in a chair, with her eyes open. After determining that Camillo was unconscious, Eric put her on the bed and attempted to perform CPR.

At approximately 9:15 p.m., Police Officer Michael Ciafardini responded to Mary's home after receiving a radio transmission from police headquarters. At approximately 9:20 p.m., paramedic Robert Fardella arrived at the home and observed members of the New Rochelle Fire Department performing CPR on Camillo. Fardella testified that, by that time, Camillo showed signs of having been dead for approximately 45 minutes to an hour. After inserting a breathing tube into Camillo, Fardella noticed pink frothy sputum which, he explained, is indicative of a heroin overdose. He also noticed a spoon with a white substance underneath a dresser drawer. The medical examiner testified that the cause of Camillo's death was acute mixed drug intoxication and that she had needle marks on her wrists, which could have been made by Camillo herself.

At approximately 9:45 p.m., Detective Christopher Greco arrived at Mary's home. According to Detective Greco, there were "obvious signs" of drug use in the second-floor bedroom, including a hypodermic needle and wax paper commonly used for packaging heroin.

At approximately 11:15 p.m., Officer Ciafardini and Detective Greco heard a loud noise coming from the third floor. They ordered whoever was there to come down the stairs, and the defendant complied. Based upon the order of protection barring the defendant from Mary's home, the defendant was taken into custody. Officer Ted Pitzel placed the defendant in his patrol car and advised him of his *Miranda* rights, then transported him to the New Rochelle police station.

Detective Carpano's trial testimony was similar to his suppression hearing testimony. At trial, he also testified that between 1:20 a.m. and 1:30 a.m., Mary consented to a search of her home, during which the police recovered a bottle of the prescription medication Xanax, hypodermic needles, and several bags stamped "Lock Down." A forensic scientist testified that one of the bags contained a trace amount of heroin.

The jury found the defendant guilty of burglary in the second degree, criminally negligent homicide, criminal injection of a

narcotic drug, criminal contempt in the first degree, and criminal possession of a controlled substance in the seventh degree. The defendant appeals from the judgment of conviction.

The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, in pertinent part, that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law" (US Const Amends V, XIV; *see Duckworth v Eagan*, 492 US 195, 201-202 [1989]; *Malloy v Hogan*, 378 US 1 [1964]). "The *Miranda* warnings are procedural safeguards intended to secure the Fifth Amendment privilege against self-incrimination by protecting individuals from the informal compulsion exerted by law enforcement officials during custodial questioning" (*People v Borukhova*, 89 AD3d 194, 211 [2011]; *see Miranda v Arizona*, 384 US at 444; *People v Paulman*, 5 NY3d 122, 129 [2005]).

In *Miranda v Arizona*, the United States Supreme Court explained that interrogations in certain custodial circumstances are presumed to be inherently coercive and "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice" (384 US at 458). Hence, the prosecution may not use any statements that stem from a custodial interrogation unless it establishes that procedural safeguards were properly followed (*see id.* at 444-445).

*Miranda* emphasizes the "badge of intimidation" created when officers do not make efforts to "afford appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice" (*id.* at 457). Hence, for a statement to be admissible, the People must prove a voluntary, knowing, and intelligent waiver of the privilege against self-incrimination (*id.* at 444). As the United States Supreme Court explained, "[t]he requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation" (*id.* at 476). While it is not necessary for a waiver to be expressly oral or written, "a valid waiver will not be presumed . . . simply from the fact that a confession was in fact eventually obtained" (*id.* at 475). However, "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege" (*id.* at 476).

Therefore, the use of a defendant's statement offends due process where his or her "will has been overborne and his [or her] capacity for self-determination critically impaired" (*Culombe v Connecticut*, 367 US 568, 602 [1961]; *see Rogers v Richmond*, 365 US 534, 540 [1961] ["convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand"]).

Furthermore, under the New York State Constitution, "[n]o person shall be . . . compelled in any criminal case to be a witness against himself or herself" (NY Const, art I, § 6). Consequently, when a suspect is interrogated without the presence of counsel and gives a statement, at a suppression hearing, the People must demonstrate, beyond a reasonable doubt, that the defendant voluntarily, knowingly, and intelligently waived his or her privilege against self-incrimination and his or her right to counsel (*see People v Mateo*, 2 NY3d 383, 413-414 [2004], *cert denied* 542 US 946 [2004]; *People v Davis*, 75 NY2d 517 [1990]; *People v Anderson*, 42 NY2d 35, 38 [1977]; *People v Ringer*, 140 AD2d 642 [1988]; *see also* CPL 60.45 [1], [2] [a]). If the People meet their burden, the burden then shifts to the defendant to prove that the police acted illegally (*see People v Berrios*, 28 NY2d 361, 367 [1971]). Determining whether an individual has voluntarily, knowingly and intelligently waived his or her rights is a factual inquiry that is based on the totality of the circumstances (*see People v Anderson*, 42 NY2d at 38-39; *People v Gotte*, 150 AD2d 488 [1989]).

Generally, the alleged police conduct must not be so "fundamentally unfair as to deny due process" or likely induce a false confession (*People v Tarsia*, 50 NY2d 1, 11 [1980]; *see People v Gordon*, 74 AD3d 1090 [2010]; *People v Green*, 73 AD3d 805 [2010]; *People v Sanabria*, 52 AD3d 743, 745 [2008]; *People v LaGuerre*, 29 AD3d 820, 822 [2006]). However, mere deception, without more, is not sufficient to render a statement involuntary (*see People v Tarsia*, 50 NY2d at 11; *People v Pereira*, 26 NY2d 265 [1970]; *People v McQueen*, 18 NY2d 337, 346 [1966]).

Here, the defendant argues that his statements should be suppressed because the detectives improperly deceived him when they explicitly lied to him by telling him that Camillo was alive and that the physicians treating her needed to know what drugs she had taken or else she could die, and implicitly threatened him with a homicide charge by stating, "[I]f you lie to me and don't tell me the truth now . . . it could be a problem."

■ Our review of the case law amply demonstrates that when interrogating a suspect, the police may, as part of their investigatory efforts, deceive a suspect, and any resulting statement will not be suppressed for that reason alone (*see e.g. People v Pereira*, 26 NY2d 265 [1970]; *People v McQueen*, 18 NY2d 337 [1966]; *People v Thomas*, 93 AD3d 1019 [2012]; *People v Jordan*, 193 AD2d 890 [1993]). However, even with a voluntary, knowing, and intelligent waiver of one's *Miranda* rights, there are boundaries the police cannot cross during an interrogation. While deception may be used to obtain a statement, police conduct must not be so "fundamentally unfair as to deny due process" (*People v Tarsia*, 50 NY2d at 11; *see* US Const Amends V, XIV; NY Const, art I, § 6; CPL 60.45 [1], [2] [a]; *Miranda v Arizona*, 384 US 436 [1966]; *People v Pereira*, 26 NY2d 265 [1970]; *People v Gordon*, 74 AD3d 1090 [2010]; *People v Green*, 73 AD3d 805 [2010]). Notably, in *People v McQueen* (18 NY2d at 346), the officers used mere deception by telling the defendant that "she might as well admit what she had done inasmuch as otherwise the victim, who she had not been told had died, would be likely to identify her," but did not threaten her with repercussions if she chose to remain silent.[1] In this case, by contrast, the detectives not only repeatedly deceived the defendant by telling him that Camillo was alive, but implicitly threatened him with a homicide charge by telling the defendant that the consequences of remaining silent would lead to Camillo's death, since the physicians would be unable to treat her, which "could be a problem" for him. While arguably subtle, the import of the detectives' threat to the defendant was clear: his silence would lead to Camillo's death, and then he could be charged with her homicide (*see Culombe v Connecticut*, 367 US at 574-575 ["(T)he risk is great that the police will accomplish behind their closed door precisely what the demands of our legal order forbid: make a suspect the unwilling collaborator in establishing his guilt. This they may accomplish not only with ropes and a rubber hose, not

---

1. In *People v McQueen* (18 NY2d 337, 342 [1966]), the defendant's trial commenced on November 9, 1964, and concluded on November 25, 1964, and was not subject to *Miranda v Arizona* (384 US 436 [1966]), which was decided on June 13, 1966, unless *Miranda* applied retroactively beyond the requirements of the United States Constitution (*see People v McQueen*, 18 NY2d at 342). The Court of Appeals recognized that *Miranda* could apply retroactively for a claim regarding an involuntary statement (*id.* at 344). However, the Court held that the defendant's statements were voluntary (*id.*).

only by relay questioning persistently, insistently subjugating a tired mind, but by subtler devices"]).[2]

In this case, the detectives coerced the defendant's confession by deceiving him into believing that Camillo was alive and implicitly threatening him with a homicide charge if he remained silent. The detectives used the threat of a homicide charge to elicit an incriminating statement by essentially telling the defendant that the consequences of remaining silent would lead to Camillo's death, which "could be a problem" for him. Faced with this Hobson's choice, the defendant had no acceptable alternative but to talk to the police. By lying to him and threatening him, the detectives eviscerated any sense the defendant may have had that he could safely exercise his privilege against self-incrimination and put the People to their proof. Either he would tell them what he knew or he would face the probability of life imprisonment if Camillo died. In light of the detectives' implicit threat of a homicide charge if the defendant remained silent, we cannot conclude that the defendant voluntarily waived his Fifth Amendment privilege against self-incrimination (*see* US Const Amends V, XIV; *Miranda v Arizona,* 384 US 436 [1966]; *Culombe v Connecticut,* 367 US at 602; *Rogers v Richmond,* 365 US at 541). Similarly, the detectives used the threat to overcome the defendant's will, and this was so "fundamentally unfair as to deny due process" (*People v Tarsia,* 50 NY2d at 11; *see* NY Const, art I, § 6; CPL 60.45 [1], [2] [a]; *People v Gordon,* 74 AD3d 1090 [2010]; *People v Green,* 73 AD3d 805 [2010]; *People v Sanabria,* 52 AD3d 743 [2008]; *compare People v Pereira,* 26 NY2d 265 [1970]; *People v McQueen,* 18 NY2d 337 [1966]; *People v Thomas,* 93 AD3d 1019 [2012]; *People v Jordan,* 193 AD2d 890 [1993]).

We thus hold that the People failed to establish, beyond a reasonable doubt, that the defendant knowingly, voluntarily, and intelligently waived his rights against self-incrimination. Accordingly, the Supreme Court should have suppressed the

---

**2.** In *Culombe v Connecticut* (367 US 568, 577, 620 [1961]), the petitioner was held without the benefit of counsel and was not advised of his constitutional rights. He was held in custody for five days and questioned intermittently by the police (*id.* at 625). After seeing his wife and sick daughter, and being urged by his wife to tell the truth, the petitioner confessed to participating in a holdup during which two men were murdered (*id.* at 616-617). The confession was admitted at trial and he was convicted of murder in the first degree (*id.* at 619). However, the United States Supreme Court held that the petitioner's confession was involuntary and its admission deprived him of due process in violation of the Fourteenth Amendment to the United States Constitution (*id.* at 621).

defendant's statements made to law enforcement officials at the police station. Since those statements are the only evidence supporting the defendant's convictions of criminally negligent homicide, criminal injection of a narcotic drug, and criminal possession of a controlled substance in the seventh degree, those convictions are based on legally insufficient evidence, and therefore must be vacated, and those counts dismissed from the indictment (*see* CPL 70.10 [1]; *People v Washington*, 8 NY3d 565 [2007]; *People v Cintron*, 95 NY2d 329 [2000]; *People v Contes*, 60 NY2d 620 [1983]; *cf. People v Ridley*, 307 AD2d 269 [2003]; *People v Carter*, 163 AD2d 320 [1990]).

The defendant also argues that there was legally insufficient evidence to convict him of criminal contempt in the first degree and burglary in the second degree. Initially, although the defendant's contention that his conviction of criminal contempt in the first degree is based upon legally insufficient evidence is unpreserved for appellate review (*see* CPL 470.05 [2]), we review it in the exercise of our interest of justice jurisdiction (*see* CPL 470.15 [6]). Under the Penal Law, a person is guilty of criminal contempt in the first degree when

> "he or she commits the crime of criminal contempt in the second degree . . . by violating that part of a duly served order of protection, or such order of which the defendant has actual knowledge because he or she was present in court when such order was issued . . . which requires the . . . defendant to stay away from the person or persons on whose behalf the order was issued, and where the defendant has been previously convicted of the crime of aggravated criminal contempt or criminal contempt in the first or second degree for violating an order of protection as described herein within the preceding five years" (Penal Law § 215.51 [c]).

In enacting this statute, the legislature recognized that " '[j]udicial orders of protection are issued chiefly to help protect victims of domestic violence from additional acts of abuse. Yet, they are violated all too frequently; sometimes with lethal—all but invariably with serious—consequences for those the orders are supposed to protect' " (*People v Gellineau*, 178 Misc 2d 790, 795 [1998], quoting Senate Mem in Support, 1996 McKinney's Session Laws of NY at 2309-2310). Hence,

> "the Legislature was seeking not only to vindicate the right[s] of the individual, the court, or society in the administration of justice, but also to stop a very

real and present danger of domestic violence through acts committed between persons who are connected to each other either by blood, by marriage, acquaintance, or who reside in the same household. The major purpose was to prevent the great cost of domestic violence to society as a whole, and not only to the victim" (*People v Gellineau,* 178 Misc 2d at 796).

Here, the order of protection was issued against the defendant, who was present in court when it was issued and, thus, had actual knowledge of the order. At trial, the defendant admitted to a special information which charged that he was previously convicted of criminal contempt in the second degree. Further, although Mary's trial testimony indicated that she attempted to have the order of protection modified or vacated, it was indisputably in effect on January 12, 2009, when the defendant entered her home. Thus, the fact that Mary may have permitted the defendant to enter her home did not render the defendant's entry lawful (*see* Penal Law § 140.00 [5]; *People v Jones,* 79 AD3d 1244, 1246 [2010]; *People v Lewis,* 13 AD3d 208, 211 [2004], *affd* 5 NY3d 546 [2005]; *People v Liotta,* 274 AD2d 751, 753 [2000]). To find otherwise would subvert the very purpose of orders of protection, which is to protect victims of domestic violence. Accordingly, viewing the evidence in the light most favorable to the prosecution (*see People v Contes,* 60 NY2d 620 [1983]), we find that it was legally sufficient to establish the defendant's guilt of criminal contempt in the first degree beyond a reasonable doubt. Moreover, upon our independent review pursuant to CPL 470.15 (5), we are satisfied that the verdict of guilt with respect to that conviction was not against the weight of the evidence (*see People v Romero,* 7 NY3d 633 [2006]).

Turning to the legal sufficiency of the evidence supporting the defendant's conviction of burglary in the second degree, pursuant to the Penal Law, as charged here, "[a] person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein" (Penal Law § 140.25), and "[t]he building is a dwelling" (Penal Law § 140.25 [2]).[3]

---

**3.** Historically, burglary was regarded as an "offense against the habitations of men" (*Rodgers v People,* 86 NY 360, 363 [1881]). The burglary statute is meant to protect an occupant, dweller, or possessor (*see Quinn v People,* 71 NY 561, 570, 573 [1878]; *People v Scott,* 195 Misc 2d 647, 650-651 [2003]). The

In this case, the indictment, the bill of particulars, and the People's theory at trial accused the defendant of committing burglary in the second degree when he entered Mary's home unlawfully in violation of a duly served order of protection with the intent to commit the offense of criminal possession of a controlled substance in the seventh degree.

Turning to the first element of burglary, "[a] person 'enters or remains unlawfully' in or upon premises when he is not licensed or privileged to do so" (Penal Law § 140.00 [5]). Generally, a person is "licensed or privileged" to enter a private premises when such an individual has obtained the consent from the owner or from someone who maintains the authority to consent (*see People v Graves*, 76 NY2d 16, 20 [1990]). Where there is an absence of "license or privilege," a person may be deemed to have entered or remained unlawfully on the premises (*id.*). Furthermore, an "intruder must be aware of the fact that he has no license or privilege to enter the premises" (*People v Uloth*, 201 AD2d 926, 926 [1994] [internal quotation marks omitted]; *see People v Reed*, 121 AD2d 574, 575 [1986] [internal quotation marks omitted]).

For example, in *People v Lewis* (13 AD3d at 211), the Appellate Division, First Department, held that the trial court properly instructed the jury that "the complainant could not grant defendant a license or privilege to enter premises from which he had been excluded by a court order" and that "the individual must comply with the order while it remains in effect, regardless of anything said or done by the occupant of the premises." Hence, "[i]n the absence of a stay, the parties are generally obligated to obey a court order until it is vacated or reversed on appeal" (*id.* at 219; *see* Penal Law § 140.00 [5]; *People v Jones*, 79 AD3d at 1246; *People v Liotta*, 274 AD2d at 753).

■ Here, as discussed above, there was a valid temporary order of protection issued against the defendant for the benefit of his mother, Mary, which was indisputably in effect on January 12, 2009, when the defendant, who was aware of the order, entered Mary's home. Accordingly, viewing the evidence in the light most favorable to the prosecution, there was legally sufficient evidence to establish that the defendant entered Mary's home unlawfully.

---

underlying policy for this statute is to protect such individuals from a "heightened danger posed when an unlawful intrusion into a building is effected by someone bent on a criminal end" (*People v Gaines,* 74 NY2d 358, 362 [1989]).

Turning next to the element of intent, burglary in the second degree, as charged here, is a criminal trespass in a building that is a dwelling "with intent to commit a crime therein" (Penal Law § 140.25 [2]; *see People v Lewis*, 5 NY3d at 548). The intent to commit a crime must exist contemporaneously with the unlawful entry (*see People v Gaines*, 74 NY2d at 359-360). "A defendant who simply trespasses with no intent to commit a crime inside a building does not possess the more culpable mental state that justifies punishment as a burglar" (*id.* at 362; *see People v Lewis*, 5 NY3d at 551-552).

■ Generally, the People do not need to prove that a defendant intended to commit a particular crime (*see People v Gaines*, 74 NY2d at 362 n 1). General intent may be sufficient to establish this element (*see People v Mackey*, 49 NY2d 274, 279 [1980]). However, where, as here, the People expressly limit their theory of the defendant's guilt of burglary to the intent to commit a specific crime, they are bound to prove the defendant's intent to commit that particular crime (*see People v Shealy*, 51 NY2d 933 [1980]; *People v Barnes*, 50 NY2d 375, 379 n 3 [1980]). Accordingly, since the indictment, as amplified by the bill of particulars, expressly charged the defendant, with respect to burglary, with the intent to commit the crime of criminal possession of a controlled substance in the seventh degree, the People had the burden of proving that the defendant, at the time he entered Mary's home, intended to commit that crime while inside.

Under the Penal Law, "[a] person is guilty of criminal possession of a controlled substance in the seventh degree when he or she knowingly and unlawfully possesses a controlled substance" (Penal Law § 220.03). Generally, "the Legislature has defined criminal possession in terms of dominion and control, and unlawful possession is a continuing offense" (*People v Carvajal*, 6 NY3d 305, 314 [2005]; *see* Penal Law § 10.00 [8]; *Matter of Johnson v Morgenthau*, 69 NY2d 148, 151-152 [1987]).

Further,

> "[t]o sustain a conviction [of] the crime of possession of a controlled substance, in its simplest form, the prosecution must prove beyond a reasonable doubt the presence of a controlled substance as statutorily defined, that it was physically or constructively possessed by the accused and that the possession was knowing and unlawful" (*People v Sierra*, 45 NY2d 56, 59-60 [1978]).

To establish constructive possession, "the People must show

that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized" (*People v Manini*, 79 NY2d 561, 573 [1992], quoting Penal Law § 10.00 [8]; *see People v Arnold*, 60 AD3d 960 [2009]; *People v Tirado*, 47 AD2d 193 [1975], *affd* 38 NY2d 955 [1976]).

■ Here, the evidence that connected the defendant with the trace amount of heroin in one of the "Lock Down" bags found in his bedroom was the inculpatory statements that he made after he was improperly deceived and threatened by the detectives. As discussed above, those statements must be suppressed. According to the trial testimony of Mary, and of Eric, the defendant's brother, Mary allowed the defendant to enter and stay in her home on a regular basis despite the order of protection issued for her benefit and against the defendant. Although the evidence at trial established the defendant's regular use of that bedroom, and his close proximity thereto when he was taken into custody, no evidence was presented to establish that the defendant possessed heroin on his person at the time of his arrest. Moreover, since Mary's home has multiple bedrooms and occupants, any of whom could have easily accessed the defendant's second-floor bedroom, even viewing the evidence, excluding the defendant's improperly admitted statements, in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620 [1983]), the evidence is legally insufficient to establish that the defendant constructively possessed heroin (*see People v Alicea*, 23 AD3d 572 [2005]; *People v Brown*, 240 AD2d 675 [1997]; *People v Webb*, 179 AD2d 707 [1992]; *People v Harvey*, 163 AD2d 532 [1990]).[4]

■ Even if the People had established the defendant's constructive possession of the heroin recovered from his bedroom, they nevertheless failed to present legally sufficient evidence establishing that the defendant intended to commit

---

**4.** We further note that in *People v Rosado* (96 AD3d 547 [2012]), the trial court convicted the defendant of two counts of criminal possession of a controlled substance in the seventh degree. On appeal, the defendant argued that the "room presumption" did not apply to seventh-degree possession. While his argument was unpreserved, the Appellate Division, First Department, reached the question in the interest of justice and held that the "room presumption and constructive possession . . . should only apply to crimes requiring intent to sell, or crimes involving amounts of drugs greater than what is required for misdemeanor possession" (*id.* at 548 [internal quotation marks and citations omitted]).

the offense of criminal possession of a controlled substance in the seventh degree at the time he entered Mary's home. Criminal possession, generally, has been defined as a "continuing offense" (*see* Penal Law § 10.00 [8]; *People v Carvajal*, 6 NY3d at 314; *Matter of Johnson v Morgenthau*, 69 NY2d at 151-152). Since criminal possession of a controlled substance in the seventh degree is a "continuing offense," viewing the evidence, excluding the improperly admitted statements, in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620 [1983]), the People could not establish, beyond a reasonable doubt, that the trace amount of heroin found in the second-floor bedroom existed at the moment of the defendant's unlawful entry into Mary's home. The "Lock Down" bag which contained the trace amount of heroin could have been there for days, or placed there immediately before or after his entry. Therefore, the People did not establish that any intent on the defendant's part to commit the offense of criminal possession of a controlled substance in the seventh degree was contemporaneous with the unlawful entry.

Accordingly, the conviction of burglary in the second degree was not supported by legally sufficient evidence.

The defendant's remaining contentions are without merit or need not be reached in light of our determination.

Accordingly, the judgment is modified, on the law and the facts, by vacating the convictions of burglary in the second degree, criminally negligent homicide, criminal injection of a narcotic drug, and criminal possession of a controlled substance in the seventh degree, vacating the sentences imposed thereon, and dismissing those counts of the indictment; as so modified, the judgment is affirmed, and that branch of the defendant's omnibus motion which was to suppress certain statements made to law enforcement officials is granted.

BALKIN, J.P., HALL and MILLER, JJ., concur.

Ordered that the judgment is modified, on the law and the facts, by vacating the convictions of burglary in the second degree, criminally negligent homicide, criminal injection of a narcotic drug, and criminal possession of a controlled substance in the seventh degree, vacating the sentences imposed thereon, and dismissing those counts of the indictment; as so modified, the judgment is affirmed, and that branch of the defendant's omnibus motion which was to suppress certain statements made to law enforcement officials is granted.